Filed 5/8/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **ALTAVION, INC.,** | |
| **Plaintiff and Respondent,** | **A134343** |
| v. | **A135831** |
| **KONICA MINOLTA SYSTEMS LABORATORY INC.,** | **(San Mateo County Super. Ct. No. CIV467662)** |
| **Defendant and Appellant.** | |

Trade secret protection " 'promotes the sharing of knowledge, and the efficient operation of industry,' " by " 'permit[ting] the individual inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it.' [Citation.]" (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 878 (*DVD Copy Control*).) Trade secret law allows the inventor to disclose an idea in confidential commercial negotiations certain that the other side will not appropriate it without compensation. "[T]he holder of the secret, [may] disclose information he would otherwise have been unwilling to share, and [this] permits business negotiations that can lead to commercialization of the invention or sale of the idea, serving both the disclosure and incentive functions of [intellectual property] law." (Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights* (2008) 61 Stan. L.Rev. 311, 336-337, fns. omitted.)

Appellant and defendant Konica Minolta Systems Laboratory, Inc. (KMSL) is a research and development subsidiary of a multinational corporation that, among other

---

[*]  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts VII.A., VII.B., and VII.D.

things, manufactures multifunction printers (also known as multifunction peripherals) (MFP's) and other devices with printing, scanning, and copying functionalities. Respondent and plaintiff Altavion, Inc. (Altavion), is a small company that invented a process for creating self-authenticating documents through the use of barcodes that contain encrypted data about the contents of the original documents. The trial court concluded that KMSL misappropriated trade secrets disclosed by Altavion during negotiations aimed at exploiting Altavion's technology. The negotiations were subject to a nondisclosure agreement and centered around the possibility of embedding Altavion's invention in one of KMSL's MFP's. During the negotiations, the invention was described as Altavion's "digital stamping technology" (DST). After the negotiations failed, Altavion discovered KMSL had filed for patents encompassing Altavion's DST. Altavion brought suit and, following a bench trial, the trial court found KMSL misappropriated Altavion's trade secrets—both Altavion's DST concept as a whole and specific DST design concepts. The court awarded Altavion damages, prejudgment interest, and attorney fees.

On appeal, KMSL contends it was improper for the trial court to base its ruling on misappropriation of Altavion's DST concept as a whole, and any other trade secrets the court found misappropriated were not adequately identified in the court's decision. KMSL further contends Altavion's DST was not protectable as a trade secret, either as a combination secret or as particular design concepts, because ideas and design concepts are not protectable trade secrets. Moreover, KMSL contends Altavion did not show the ideas were kept secret or had independent economic value. KMSL also challenges the trial court's award of damages, prejudgment interest, and attorney fees. We reject KMSL's contentions and affirm the trial court's judgment.

BACKGROUND

From the voluminous record in the present case we set forth only those facts relevant to resolution of the issues on appeal. We recite the facts in the manner most favorable to the judgment and resolve all conflicts and draw all inferences in favor of respondent Altavion. (*SCI California Funeral Services, Inc. v. Five Bridges Foundation*

2

(2012) 203 Cal.App.4th 549, 552-553; see also *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1056, fn. 1.) Conflicts in the evidence are noted only where pertinent to the issues on appeal. (*Pool*, at p. 1056, fn. 1; *SCI California Funeral Services, Inc.*, at p. 553.)[1]

*Altavion's DST*

Dr. Ali Moussa is the President and founder of Altavion. He founded Altavion in 2000 with the goal of developing DST to enable the self-authentication of digital and paper documents.[2]

Altavion's DST was designed to encode the content of an original document into a small (maximum 1" x 1") barcode (also called a "stamp") printed on the document. In order to create the barcode, a scanned version of the original document would be divided into cells and the pixel-level data about each cell would be represented in the barcode in a highly compressed form. By comparing the data encrypted in the barcode with a subsequent version of the document, Altavion's DST would show whether and where the

---

[1]  Our review of the record was made considerably more difficult by the parties' failure to adhere to the rules governing factual summaries on appeal. The record consists of 54 volumes of reporter's transcripts and 16 volumes of appendices. Together, these materials comprise more than 8,000 pages. (See *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 ["duty to adhere to appellate procedural rules grows with the complexity of the record"].) Despite the record's size, the parties have provided citations only to page numbers, although the rules require citation "to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C); see also *SCI California Funeral Services, Inc. v. Five Bridges Foundation*, *supra*, 203 Cal.App.4th at p. 552, fn. 1.) Moreover, KMSL did, at best, a poor job of complying with its obligation to fairly summarize the facts in the light favorable to the judgment (*Western Aggregates, Inc.*, at p. 290), and Altavion frequently failed to support its factual assertions with adequate citations to the record (Cal. Rules of Court, rule 8.204(a)(1)(C)).

[2]  Although KMSL raises issues on appeal regarding the trial court's use of the phrase DST, that was a term repeatedly used by KMSL itself in internal project documents. For example, a Spring 2004 "[KMSL] Digital Stamping Technology Proposal" repeatedly used the phrase "digital stamping technology" (and often "Altavion" DST) and the abbreviation DST. Similarly, the phrase and/or abbreviation were used in two 2004 evaluations of Altavion's software and a July 2005 KMSL technology plan, among other KMSL documents. Moreover, counsel for KMSL used the phrase at trial. Further, the phrase appears repeatedly in Altavion's second amended and operative complaint.

3

document had been altered by searching for alterations at the pixel-level. Because the barcode would permit the document to be authenticated without involvement of a third party, Altavion claimed its DST would create "self-authenticating" documents. Altavion's DST was implemented by software programmed to execute the algorithms necessary to perform the various barcode creation and authentication functions.[3]

Altavion's barcode, and especially its color barcode, could contain far more data in a small space than existing barcodes. Grayscale or color barcodes, as compared to black and white barcodes, represent data with higher density, enabling more data to be represented in a given area. However, the development of a color barcode presented a distinct technical challenge because over time the colors on a printed barcode are subject to degradation, which can inhibit read back of the data contained in the barcode. Altavion resolved this problem by using "color reference cells" to aid in reconstruction of the encoded data. The company's implementation of the approach was unique, in that Altavion's barcode employed multiple reference cells for each color, and by an averaging process a range of values could be determined to represent each color.

_____

[3]   In an internal project proposal, KMSL described Altavion's DST as follows: "Altavion has answered these technology challenges by developing the only known technology which provides document authentication checking via an embedded stamp and additionally adds tamper location discovery or integrity checking for an unauthentic document. The Altavion document authentication solution falls into the category of Digital Stamping and is applied to the pixelized rendering of a digital document, not the content in its raw data form. With Altavion's [DST], it is now possible to take a digital document and place a visible [two]-Dimensional barcode or digital stamp of authenticity on the document. Encoded in this machine readable stamp are various types of information including authenticity data, integrity data, and administrative data. By placing a digital stamp on a digital document, the party administering the stamping process inherently claims that the documents are considered authentic at the time of stamping and thereafter. And through the use of DST the party administering the stamping process now has a mechanism via the digital stamp to verify that the document is authentic or not, and if unauthentic be able to locate where the document had been altered."

*Altavion's Relationship With KMSL*

KMSL is a research and development company that develops technologies for its parent company, Konica Minolta Business Technologies, Inc., which, among other things, manufactures products including MFP's that can copy, scan, and print documents.[4] Some of the KMSL personnel involved in the events underlying this case include KMSL's president, Hiroshi Tomita, former consultant Paul Cattrone, computer scientist Dr. Wei Ming, and software engineer Vivek Pathak. Tomita handled the business negotiations with Altavion; Cattrone was hired in February 2004 to manage the digital stamping project; Ming helped evaluate Altavion's DST; and Pathak was hired in September 2004 to help develop KMSL's own DST.

Altavion was introduced to KMSL through William Zivic, a salesman employed at the time by Minolta Business Solutions. Although the terms of the agreement are unclear, in July 2003 Altavion and KMSL entered into a nondisclosure agreement (NDA), in which the companies agreed that any confidential information disclosed during their subsequent negotiations would be kept confidential.[5] Prior to discussions with Altavion, KMSL had no digital stamping projects in progress or products in development. Indeed, Tomita admitted "the first consideration [he] had ever given to [DST] was brought about by [his] discussions with Altavion."

---

[4]  Altavion's second amended and operative complaint named as defendants KMSL; sales, support, and service company Konica Minolta Business Solutions U.S.A., Inc.; parent company Konica Minolta Business Technologies, Inc.; Konica Minolta Technology Center, Inc.; Konica Minolta Holdings, Inc.; and former KMSL consultant Paul Cattrone. Defendants Konica-Minolta Holdings, Inc., and Cattrone were voluntarily dismissed before trial, and the trial court found Altavion proved its misappropriation claim against only KMSL. Thus, KMSL is the only defendant involved in this appeal. It also should be noted there was a merger between Konica Corporation and Minolta Co., Ltd., in October 2003. Altavion began its relationship with a Minolta company, but, for convenience, all references in this decision will be to KMSL.

[5]  The trial court rejected Altavion's claim for breach of the NDA because, although the evidence showed an NDA was executed and the parties agreed to protect confidential information, Altavion failed to present evidence of all the material terms of the NDA. KMSL does not dispute on appeal the trial court's finding that the parties agreed to protect confidential information.

KMSL's interest in Altavion's DST was in developing technology for authenticating printed documents, rather than for documents that remain only in a digital environment. For a variety of reasons, it is more difficult to authenticate printed documents than electronic documents (an issue known as the "closed loop problem"). For example, an expert for KMSL at trial explained that problems can arise in the printing, storage, and scanning processes that make it more difficult to authenticate a paper document with a stamp.

In a December 15, 2003 letter to Moussa, Tomita wrote, "At [KMSL] we are studying using your unique technology for digital stamping for possible use in multiple applications in current and future products and for jointly developing it further for even better utilization." The parties sought to negotiate terms by which Altavion's DST could be embedded in a KMSL MFP. Altavion and KMSL discussed the possibility of a pay-per-stamp revenue model.

KMSL consultant Cattrone assesssed evaluation software provided by Altavion and authored a report entitled "Altavion Digital Stamping Software Evaluation." The report concluded, "Altavion is the first available solution for creating a machine readable authentication barcode which can be later used to not only authenticate the document, but on false authenticity locate the areas within the document where tampering or alteration has occurred." In reporting the testing results, the report stated, "In all cases, the verification software was able to successfully authenticate unaltered digital documents. For most cases, when a document was found to be altered and not authentic, the software was able to successfully identify the areas within the document—graphic or text—which had been tampered with." The report also identified further areas for evaluation and stated that Altavion's technology "does contain a number of problems and functional anomalies in its current implementation in both the stamp creation and integrity checking software components."

A February 27, 2004 KMSL project development planning report (February 2004 planning report) articulated KMSL's project development strategy employing Altavion's DST. It stated, "This project will develop a Digital Stamping solution for use as a

6

Konica-Minolta document authentication security technology. The solution will be built as two SDKs—Digital Stamp Creation SDK and Digital Stamp Authentication & Integrity Check SDK.[6] Both SDKs will be built around a digital stamping core functionality component. Altavion will provide the core functionality component as they have a patent pending digital stamping technology which can create and verify authentic documents as well as discover tamper locations in unauthentic documents. With Altavion technology a small amount of essential data extracted from the image is required and can be encoded into a digital stamp as small as ½" x ½". [KMSL] will drive the development of Altavion's core technology to provide Konica[-]Minolta with a solution that satisfies the basic requirements for creation and verification of a digitally stamped document." It also stated, "By developing [an] SDK around Altavion's digital stamping core technology, Konica-Minolta will develop competing patentable technologies and marketable products which work to close the Printer/Scanner Loop to provide document authenticity and integrity validation regardless of digital or print form."

The February 2004 planning report distinguished Altavion's digital stamping process from a process patented by a competitor, Canon Inc., stating "The amount of data required to authenticate and verify integrity with the Altavion method is their key differentiating technology. Where as the Canon patent reduces the original document size in its approach to embed 2D barcodes, the Altavion solution does not apply any transformation to the original document as the stamp can be generated as small as ½" x ½"." The February 2004 planning report also included a "[p]atent application plan," indicating that "a patent could be filed which describes an Altavion technology based

---

6   Cattrone explained in his testimony that an "SDK" is a "Software Development Kit." He testified that KMSL sought an SDK from Altavion that would have allowed KMSL "to integrate [KMSL] technologies on top of Altavion's core technology." In particular, KMSL was "interested in utilizing Altavion's digital-only core technology and having it produced in a such a way that we could write software that helped close the loop around it, technologies that wrapped around it to extend the security technology to paper and . . . allow for a closed loop workflow to occur."

method for creating self-authentic[ating] with embedded integrity data documents which can be authenticated from digital or print form."

In an April 1, 2004 e-mail, KMSL proposed to pay Altavion a fee for development of an SDK for a KMSL machine and further development of Altavion's grayscale and color barcodes. In e-mail communications on April 21 and 22, KMSL and Altavion discussed the possibility of a $400,000 fee, although it was contingent on an evaluation of Altavion's software. On April 27 and May 11, KMSL paid a total of $50,000 to Altavion for new evaluation software. The new software addressed some of the issues raised and enhancements requested in Cattrone's evaluation of the previous version of the software.

On August 31, 2004, KMSL and Altavion executed a memorandum of understanding (MOU), which stated that KMSL "will continue to recognize that Altavion's unique implementation of [DST] is Altavion's own intellectual property and will continue to protect [it]." Unbeknownst to Altavion, even before execution of the MOU, KMSL had already begun filing a series of patent applications encompassing Altavion's DST.[7] Specifically, on June 28 and August 9, 2004, KMSL filed patent applications for color barcode producing methods, with KMSL's Ming listed as the inventor on the June application and Ming and Tomita listed as inventors on the August application. Both applications described a method "to keep the integrity or authenticity of the color barcode" through the use of color reference cells in the barcode. KMSL ultimately filed 24 United States DST patent applications, and eight United States patents were issued. The patents and applications identified varying combinations of Tomita, Ming, Cattrone, and Pathak as inventors.

The trial court ultimately found that KMSL "had no idea, interest or information about DST . . . or use of bar codes prior to their dealings with" Altavion. Among other things, the trial court rejected as unreliable the meager evidence that Tomita and Ming

---

[7] There was testimony at trial that Moussa told KMSL that Altavion had applied for patents on its DST, although in fact it had not, as Ming discovered during a patent search. At trial, Moussa explained he had doubts that applying for patents was the best strategy for Altavion, as compared to protecting the company's ideas as trade secrets.

independently developed the DST concepts reflected in KMSL's patents. KMSL does not dispute those findings on appeal.

In September 2004, shortly after execution of the MOU, KMSL hired software engineer Pathak to work on the digital stamping project and, specifically, to develop "closed loop technologies." Pathak had access to the evaluation software provided by Altavion. In a September 17 e-mail to Tomita, Cattrone said he had "asked [Pathak] to analyze the Altavion software and think about ways in which we can achieve similar results with the focus on a closed loop digital stamp." He also wrote, "[Pathak] understands and knows well that there are many ways to achieve similar Altavion'esque results within the digital domain." The e-mail also asserted there were problems in the relationship with Altavion. For example, Cattrone opined, "It is unlikely that we will get a digital stamping SDK from Altavion in the near future—our signing of the MOU meant nothing to [Moussa]."

KMSL and Altavion reached an impasse in their negotiations in the fall of 2004. The parties were unable to agree on the terms for KMSL's payment of a development fee to Altavion, or the scope of an SDK to be provided to KMSL.

*The Present Lawsuit*

In October 2006, Moussa learned about KMSL's patent filings. In November 2007, Altavion filed the present lawsuit. In the second amended and operative complaint (Complaint), Altavion sued KMSL, Cattrone, and four other Konica Minolta entities (see fn. 4, *ante*). Altavion alleged causes of action for trade secret misappropriation, breach of the NDA, and a variety of other torts. KMSL filed a cross-complaint alleging (among other things) fraud based on Moussa's false statements that he had applied for patents.

By the time of trial, the only remaining Altavion causes of action were for breach of the NDA and for misappropriation of Altavion's trade secrets. The trial court issued a tentative statement of decision in July 2011 and a final statement of decision (FSOD) in November. The court ruled in favor of KMSL on Altavion's claim for breach of the NDA and in favor of Altavion on KMSL's fraud claim. Neither of those two claims is at issue on appeal.

9

The court found in favor of Altavion and against KMSL (but not against the other Konica Minolta defendants) on Altavion's misappropriation claim. The trial court awarded damages of $1 million and prejudgment interest of $513,400, for a total of $1,513,400. After further proceedings, the trial court awarded attorney fees to Altavion in the amount of $3,297,102.50, as well as amounts for expert fees and costs. The court also awarded costs to three of the Konica Minolta companies that had not been found liable for misappropriation.

DISCUSSION

I.  *Summary of Trade Secret Law*

In 1984, the Legislature "adopted without significant change" the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.).**8** (*DVD Copy Control*, *supra*, 31 Cal.4th at p. 874; *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 221; Trade Secrets Practice in Cal. (Cont.Ed.Bar 2d. ed. 2013) § 1.2, p. 1-2.) Nearly all states have adopted the UTSA; although there are some variations, case law applying UTSA enactments in other states is generally relevant in applying California's UTSA. (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 955; Trade Secrets Practice in Cal., at p. 1-2.)

The UTSA "creates a statutory cause of action for the misappropriation of a trade secret." (*Brescia v. Angelin* (2009) 172 Cal.App.4th 133, 143.) The statute defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)**9**

---

**8**  All further undesignated statutory references are to the Civil Code.

**9**  Prior to the 1984 enactment of the UTSA, California had followed the Restatement of Torts definition of a trade secret. (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 49.) Although it is not identical, the UTSA definition is similar to the common law definition. (See *Vacco Industries, Inc.*, at p. 50 ["[b]y its adoption of the

10

"Trade secret misappropriation occurs whenever a person: (1) acquires another's trade secret with knowledge or reason to know 'that the trade secret was acquired by improper means' (§ 3426.1, subd. (b)(1)); (2) discloses or uses, without consent, another's trade secret that the person '[u]sed improper means to acquire knowledge of' (*id.*, subd. (b)(2)(A)); (3) discloses or uses, without consent, another's trade secret that the person, '[a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was' (a) '[d]erived from or through a person who had utilized improper means to acquire it' (*id.*, subd. (b)(2)(B)(i)), (b) '[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use' (*id.*, subd. (b)(2)(B)(ii)), or (c) '[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use' (*id.*, subd. (b)(2)(B)(iii)); or (4) discloses or uses, without consent, another's trade secret when the person, '[b]efore a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake' (*id.*, subd. (b)(2)(C))." (*DVD Copy Control*, *supra*, 31 Cal.4th at p. 874.)

In *DVD Copy Control*, the California Supreme Court outlined the purposes underlying the protections provided by trade secret law. The court explained, " '[t]he basic logic of the common law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large.' [Citation.] Based on this logic, trade secret law creates a property right 'defined by the extent to which the owner of the secret protects his interest from disclosure to others.' [Citation.] In doing so, it allows the trade secret owner to reap the fruits of its labor [citation] and protects the owner's 'moral entitlement to' these fruits [citation]. As such, 'trade secrets have been recognized as a constitutionally protected intangible property interest.' [Citation.]" (*DVD Copy Control*, *supra*, 31 Cal.4th at p. 880.) As we noted at the outset of this decision, " 'Trade secret law promotes the sharing of knowledge, and the efficient operation of industry; it permits the individual

[UTSA], California effectively adopted the common law definition"].) Therefore, cases decided prior to 1984 are relevant in applying the UTSA.

11

inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it.' [Citation.]" (*Id.* at p. 878.) "Trade secret law also helps maintain 'standards of commercial ethics . . . .' [Citation.] . . . By sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes 'the inevitable cost to the basic decency of society when one . . . steals from another.' [Citation.] In doing so, it recognizes that ' "good faith and honest, fair dealing, is the very life and spirit of the commercial world." ' " (*Id.* at p. 881.)

II. *Standard of Review*

We review for substantial evidence the trial court's finding that KMSL misappropriated Altavion's trade secrets. (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521 (*Morlife*); *Vacco Industries, Inc. v. Van Den Berg*, *supra*, 5 Cal.App.4th at p. 50.) " ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." ' " (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.) "[W]e presume that the record contains evidence to sustain every finding of fact. [Citation.] It is the appellant's burden to demonstrate that it does not." (*Ibid*.) An appellant who challenges a trial court's factual determination following a nonjury trial "must marshal *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding. [Citation.]" (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 (*Yield Dynamics*).)

We review the trial court's damages award for substantial evidence. (*Morlife*, *supra*, 56 Cal.App.4th at p. 1528.) The trial court's attorney fee award "will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence." (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 577.)

III. *Were Altavion's Trade Secrets Adequately Identified?*

"It is critical to any [UTSA] cause of action—and any defense—that the information claimed to have been misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must, prior to commencing discovery, 'identify the trade secret with reasonable particularity.' (Code Civ. Proc., § 2019.210; see Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*[, *supra*,] 61 Stan. L.Rev. [at p.] 344 [plaintiff should be required to 'clearly define[] what it claims to own, rather than (as happens all too often in practice) falling back on vague hand waving'].)" (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 221 (*Silvaco*), disapproved on another ground in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337.)[10] "[U]ntil the content and nature of the claimed secret is ascertained, it will likely be impossible to intelligibly analyze the remaining" elements that constitute the cause of action. (*Id.* at p. 220.) The trade secret must be described "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 253 (*Diodes*); accord, *Brescia v. Angelin*, *supra*, 172 Cal.App.4th at p. 144 [noting that Code Civ. Proc., § 2019.210 was intended to codify *Diodes*]; *Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 835; *Imax Corp. v. Cinema Technologies, Inc.* (9th Cir. 1998) 152 F.3d 1161, 1164-1165; *Computer Economics, Inc. v. Gartner Group, Inc.* (S.D.Cal. 1999) 50 F.Supp.2d 980, 984-985.)

As explained in *Computer Economics, Inc. v. Gartner Group, Inc.*, *supra*, 50 F.Supp.2d at page 985, the rule requiring a plaintiff to describe its trade secrets before the commencement of discovery serves several purposes: it discourages the filing of

---

[10] Section 2019.210 of the Code of Civil Procedure provides, "In any action alleging the misappropriation of a trade secret under the [UTSA] . . . , before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."

13

meritless claims, prevents plaintiffs from using the discovery process to uncover the defendant's trade secrets, assists the trial court in framing the scope of discovery, and "enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges." (Accord, *Perlan Therapeutics, Inc. v. Superior Court* (2009) 178 Cal.App.4th 1333, 1343; *Brescia v. Angelin*, *supra*, 172 Cal.App.4th at p. 144; *Advanced Modular Sputtering, Inc. v. Superior Court*, *supra*, 132 Cal.App.4th at pp. 834, 836.)

KMSL contends the trial court's judgment must be reversed because both Altavion and the court failed to identify with sufficient particularity the trade secrets KMSL misappropriated. Each claim must be analyzed separately.

A. *Altavion Did Not Fail to Adequately Identify Its Trade Secrets.*

The cases discussed above and the cases KMSL relies upon on appeal relate to a plaintiff's obligation to identify the allegedly misappropriated trade secrets with sufficient particularity for purposes of discovery and trial. (See *Silvaco*, *supra*, 184 Cal.App.4th at pp. 221-222; *Perlan Therapeutics, Inc. v. Superior Court*, *supra*, 178 Cal.App.4th at pp. 1343-1352; *Advanced Modular Sputtering, Inc. v. Superior Court*, *supra*, 132 Cal.App.4th at pp. 834–836; *Diodes, supra*, 260 Cal.App.2d at p. 253; *Imax Corp. v. Cinema Technologies, Inc.*, *supra*, 152 F.3d at pp. 1164-1167; *Agency Solutions.Com, LLC v. TriZetto Group, Inc.* (E.D.Cal. 2011) 819 F.Supp.2d 1001, 1017-1018; *Bunnell v. Motion Picture Ass'n of America* (C.D.Cal. 2007) 567 F.Supp.2d 1148, 1155; *IDX Systems Corp. v. Epic Systems Corp.* (W.D.Wis. 2001) 165 F.Supp.2d 812, 816-817.) In the present case, Altavion identified the allegedly misappropriated trade secrets pursuant to Code of Civil Procedure section 2019.210 in a third amended identification (Amended Identification) dated May 20, 2009. On August 27, 2010, Altavion served KMSL with an "Outline of Trade Secrets Misappropriated by Defendants" (Outline), which was admitted at trial as exhibit 1032. In the Outline, Altavion identified and detailed aspects of eight trade secrets (numbered 1B, 1C, 2, 4, 7, 11, 12, & 15). After the presentation of Altavion's case at trial, the trial court granted KMSL's motion for nonsuit as to misappropriation of trade secrets 7 and 11.

14

On appeal, KMSL asserts "no trade secret was sufficiently identified to permit [KMSL] to present a meaningful defense." However, KMSL presents no reasoned argument with citations to authority (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785) that Altavion's Amended Identification or Outline were overly vague or otherwise failed to describe the allegedly misappropriated information with "sufficient particularity" to separate it from matters of general knowledge and to permit KMSL to ascertain "at least the boundaries within which the secret lies." (*Diodes, supra*, 260 Cal.App.2d at p. 253; see also *Advanced Modular Sputtering, Inc. v. Superior Court*, *supra*, 132 Cal.App.4th at pp. 835-836.) *Instead*, KMSL argues the trade secrets identified by Altavion were not the same as the trade secrets the trial court found misappropriated in the FSOD. In particular, KMSL focuses on the fact that, in identifying its trade secrets, Altavion largely did not use the phrase that was used by the trial court—DST—and specifically did not use the phrase in any of the numbered trade secrets still at issue at the conclusion of the trial. KMSL asserts, "[i]nstead, the lists described a multitude of specific algorithms and process steps that Altavion claimed could be used to create barcodes or authenticate documents and which were allegedly implemented in its software." Arguing the trade secrets as described in the FSOD differ from those identified by Altavion is not, however, a claim that Altavion failed to comply with its statutory obligation to adequately identify its trade secrets either before or during trial. KMSL has not shown any error in that respect.

B. *The Trial Court Did Not Err in Its Identification of the Misappropriated Trade Secrets.*

The heart of KMSL's claim on appeal is that it was improper for the trial court to base its ruling on misappropriation of Altavion's "DST," and that, otherwise, the trial court failed to adequately identify the trade secrets it found had been misappropriated.

A trial court's statement of decision must explain "the factual and legal basis for its decision as to each of the principal controverted issues at trial." (Code Civ. Proc., § 632.) It will be deemed adequate "if it fairly discloses the determinations as to the ultimate facts and material issues in the case." (*Central Valley General Hospital v. Smith*

15

(2008) 162 Cal.App.4th 501, 513.) "Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358; accord, *Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.) "[F]indings of fact are liberally construed to support the judgment." (*Estate of Young*, at p. 76.) If the statement of decision "does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634; see also *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

   1. *The Trial Court's Analysis*

   In the FSOD the trial court frequently used the umbrella term DST to refer to the whole of Altavion's barcode technology. The court explained Altavion's DST was a method of creating "a self-authenticating paper document, through the use of a digital stamp (which is also self-authenticating). It is 'unique,' according to [Altavion], in that it could detect alterations as well as show where the alterations had occurred in the document." The court further explained: "A digital stamp is a type of bar code. DST is data represented as an image. [¶] [Altavion's] bar code is not a miniature image of the entire document nor does it digitize all data in an entire document, called 'compression.' Rather, it is the 'thumbprint' of the document, a form of essential data, which can be used to self-authenticate the document as a true and correct copy of the original document. Part of this process is that the technology 'grids' the subject document into squares, and then selects reference information to create the barcode. [¶] According to Moussa, [Altavion's] bar code has three main components: (1) Textual Data, which is the text in the bar code; (2) Statistical Data, which keeps the bar code within one inch by one inch in size . . . , and (3) Reference Data. [¶] [Altavion's] technology allegedly does two things: (1) Authentication, i.e., Has the document been altered? and (2) Integrity, i.e., Where has the document been altered?" The court also explained that, in 2002, Altavion created

16

grayscale and color barcodes, which could hold more information than black and white barcodes at the same size.  Altavion sought to partner with KMSL to embed Altavion's DST in one of KMSL's MFP's.

Prior to analyzing the evidence of misappropriation, the trial court acknowledged the parties had different purposes in developing DST.  It explained that Altavion's "focus is a self-authenticating bar code that takes 'thumbprint' details from a document for purposes of double-checking document integrity and showing where (if anywhere) the document has been altered."  On the other hand, KMSL's "focus is a bar code . . . to preserve document integrity such that the document itself is preserved, so that the document text and images are not distorted by copying, scanning, printing, age or fading over time.  The bar code is to preserve the document, including its text and images (and colors)."  Nevertheless, the court reasoned that "taking the idea of one person and using that same idea for another purpose does not make it the second person's 'new' idea."

The trial court ultimately found KMSL misappropriated Altavion's DST, especially through KMSL's patents.  The court stated, KMSL "used one or more trade secrets of [Altavion] in attempting to create [KMSL's] own DST.  Further the Court finds that, *at the very least*, [11 specified patents and patent applications] disclose or use a trade secret (or component part of a trade secret) of Altavion."  The trial court described the secret information provided by Altavion to KMSL as "information . . . regarding its DST technology."  In addition to finding KMSL misappropriated Altavion's DST concept as a whole, it is also clear, as detailed below, the trial court found KMSL misappropriated particular design concepts identified in Altavion's Amended Identification and Outline, especially aspects of trade secrets 1B, 1C, 2, and 12.

2.  *Misappropriation of Altavion's DST as a Combination of Design Concepts*

As explained above, the trial court found KMSL misappropriated Altavion's DST concept as a whole, both by using Altavion's DST in developing KMSL's own DST and

17

by disclosing aspects of Altavion's DST in 11 of KMSL's patents and patent applications.**11**

At the outset, we reject any contention that Altavion's DST concept on the whole was inherently not protectable as a trade secret. Because (as explained in part IV.B.2., *post*) the detailed design concepts underlying Altavion's DST were undisclosed, a finding of trade secret appropriation could be based on misappropriation of Altavion's DST concept as a whole. That is so because, even if some or all of the elements of Altavion's design were in the public domain and thus unprotectable, the *combination* was a protectable trade secret if it was secret and had independent economic value (see part IV.C., *post*). For example, in *Rivendell Forest Products v. Georgia-Pacific* (10th Cir. 1994) 28 F.3d 1042, 1043, the plaintiff lumber business alleged a competitor misappropriated a software system that permitted the plaintiff to provide special customer services and manage distribution. The 10th Circuit concluded the trial court erred in requiring "that the software system be examined bit by bit with the further requirement that Rivendell demonstrate protectability of its elements or some of them rather than the protectability of the software system as a whole." (*Id.* at p. 1045.) The court explained, "the doctrine has been established that a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." (*Id.* at p. 1046; see also *Harvey Barnett, Inc. v. Shidler* (10th Cir. 2003) 338 F.3d 1125, 1130 [reversing a district court's grant of summary judgment because it looked at the components of the plaintiff's infant swimming program "in isolation, rather than as a whole, in determining that [plaintiff] does not possess a trade secret"]; *3M v. Pribyl* (7th Cir. 2001) 259 F.3d 587, 595-596; *Integrated Cash Mgmt. Serv. v. Digital Transactions* (2d Cir. 1990) 920 F.2d 171, 174; *Imperial Chem. Indus. Ltd. v. National Distillers &*

---

**11** As explained in part IV.B., *post*, although KMSL misappropriated the whole of Altavion's DST *concept*, it did not misappropriate the underlying source code, which was never revealed to KMSL.

*Chem. Corp.* (2d Cir. 1965) 342 F.2d 737, 742.) Similarly, Altavion's implementation of DST was potentially protectable as a "combination of characteristics and components" (*3M v. Pribyl*, at p. 595), regardless of whether particular design concepts separately qualified for protection as trade secrets.

KMSL's primary argument on this point is that DST "was never identified [by Altavion] as a misappropriated trade secret" and the trial court's finding that KMSL misappropriated Altavion's DST means the court found "[KMSL] misappropriated something else that wasn't on the trial list." The thrust of the argument is that the trial court's finding of misappropriation of Altavion's DST was not "fair" and frustrated KMSL's right to " 'mount a defense.' " It is true Altavion's Amended Identification and Outline did not identify "DST" as a combination trade secret, but it is disingenuous for KMSL to suggest it was unaware what the trial court meant in referring to Altavion's DST. As we noted earlier (fn. 2, *ante*), the parties regularly used the phrase "DST" during negotiations and during the litigation to describe the technology KMSL sought to obtain from Altavion. The Complaint alleges, in paragraph 13 of the general allegations, that Altavion "has created and perfected a novel set of digital document security platform technologies, which are the first of their kind to provide the dual functionality of *document authentication* via the use of novel stamp embedding techniques and *document integrity assessment* via novel tamper detection techniques. [Altavion's] proprietary digital document security platform technologies are collectively referred to as Digital Stamping Technology ('DST' or 'DST Platform')." Paragraphs 48 and 49 of the misappropriation cause of action explained that Altavion's "DST Platform" and "DST Solutions Suite" were "collectively referred to as 'Trade Secrets,' " and alleged the defendants "misappropriated portions of [Altavion's] DST Trade Secrets by obtaining such Trade Secrets from Dr. Moussa and [Altavion] during discussions, negotiations, meetings and other communications." Accordingly, it is unmistakable the trial court used the phrase DST to refer to Altavion's secret barcode technology, taken as a whole, and there can be no question that KMSL understood what the trial court referred to in using the phrase DST.

Although the Amended Identification and the Outline did not list "DST" as a misappropriated trade secret, KMSL does not explain in what ways the concepts the court identified as Altavion's DST differ from the trade secret concepts identified by Altavion that were the subject of the proceedings in the case. KMSL does not show "Altavion's DST" as described in the FSOD differs from the digital stamping concepts described in Altavion's Complaint, Amended Identification, or Outline. Neither does KMSL show "Altavion's DST" as described in the FSOD differs from the digital stamping concepts that were the subject of evidence and argument presented at trial.[12] In particular, KMSL has not demonstrated how it was prejudiced by the trial court's finding it misappropriated the "forest" of Altavion's DST as opposed to individual "trees" referenced in Altavion's Amended Identification and Outline. It is difficult to imagine what additional evidence KMSL could have presented to show it did not misappropriate Altavion's DST concept as a whole, since such misappropriation could be established by the evidence that KMSL made use of Altavion's DST in developing its own DST and DST patents.[13]

KMSL denies this is "a debate about semantics." However, absent a failure of proof supporting the trial court's findings, and absent legal authority and reasoned

---

[12] KMSL characterizes Altavion's Amended Identification and Outline as describing "a multitude of specific algorithms and process steps that Altavion claimed could be used to create barcodes or authenticate documents and which were allegedly implemented in its software." By comparison, as noted previously, the trial court stated that Altavion's DST was a method of creating "a self-authenticating paper document, through the use of a digital stamp (which is also self-authenticating)."

[13] On appeal, KMSL does not argue there was no substantial evidence supporting the trial court's finding that KMSL did not independently develop the digital stamping concepts reflected in its patents. And KMSL does not dispute that use of Altavion's trade secrets to further its own development would constitute misappropriation. (See *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1383 ["[e]mploying the confidential information in manufacturing, production, *research or development*, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use" (italics added)].) Thus, even if the patents did not ultimately disclose Altavion's DST in all its particulars, KMSL's use of Altavion's DST *on the whole* to further its own DST development and craft its patents and patent applications was a proper basis for a misappropriation finding.

20

analysis why the trial court's findings deprived KMSL of a fair trial, KMSL has failed to show the trial court's determination it misappropriated Altavion's DST concept as a whole was reversible error. (See Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 ["[n]or will this court act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial"]; see also *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

     3. *Misappropriation of Particular Design Concepts Underlying Altavion's DST*

     In any event, the trial court adequately identified the particular DST design concepts misappropriated by KMSL. KMSL asserts the FSOD "does not find—and given the absence of any evidence could not have found—that any alleged trade secret on Altavion's trial list meets the statutory definition of a 'trade secret.' " KMSL is mistaken. Although the FSOD does not analyze each aspect of trade secrets 1B, 1C, 2, 4, 12, and 15 and identify whether each of those aspects was misappropriated by KMSL, the FSOD *does* identify specific aspects of the identified trade secrets that were misappropriated by KMSL.[14]

     In the FSOD, the trial court described KMSL's patent applications and patents and then found, "*at the very least* . . . Patent '769 (and related Patent Application '224), Patent '855 (and related Patent Application '229), Patent '865 (and related Patent Application '563), Patent Application '608, Patent Application '621, Patent Application '035, and Patent Application '138 disclose or use a trade secret (or component part of a trade secret) of Altavion."[15]

---

[14] It is clear the trial court did not find that *all* aspects of the trade secrets were misappropriated, because several of Altavion's numbered trade secrets reference algorithms the court found were never disclosed to KMSL.

[15] For purposes of consistency, we continue to use the parties'/trial court's format of referring to the patent or patent application number by its last three numeric digits.

21

The FSOD describes Patent Application '608 as a method to preserve the integrity of barcode colors through the use of color reference cells, demonstrating the trial court found KMSL misappropriated Altavion's idea for using color reference cells to preserve the integrity of the colors of the barcode.[16] Patent Application '608 describes "an apparatus and a method to keep the integrity or authenticity of the color barcode. Such is accomplished by the color information portion of the color barcode representing the color information about what colors are used for color tiles of data portion of the color barcode and an apparatus and a method for producing and reproducing such color barcode." The FSOD also describes KMSL's Patent Application '347 and related Patent '817, which also relate to color barcodes using color reference cells, including color averaging. Altavion's trade secrets 1B, 2, and 12 relate to its process for creating a color barcode with color reference cells and color averaging.

The trial court's findings also reflect its determination that KMSL's patent applications and patents misappropriated other aspects of Altavion's DST design, including at least the process steps of scanning a page to locate blank space available to locate a barcode (Patent '769 and related Patent Application '224; Patent Application '035); partitioning the image of a document into a grid of cells (Patent '865 and related Patent Application '563); using compression to encode data representing a document's contents in a digital stamp (Patent Application '035; Patent '769 and related Patent Application '224; and Patent '855 and related Patent Application '229); and, in detail, using a barcode to authenticate a document by detecting alterations and indicating the locations of the alterations (Patent Application '621 and Patent Application '035).[17] In

---

[16] In its Outline, Altavion stated that "[c]reating a color barcode by employing color reference cells" was not a trade secret 1B "element" for which it claimed misappropriation; but, in trade secret 12, it claimed as a misappropriated secret its "[s]ystem and method for creating a novel high density color 2D barcode employing color 'reference cells' to diminish the effects of color decay or degradation on recognizing and reading back color barcode content."

[17] The trial court also pointed out that KMSL's Patent Application '138 and Patent '865 actually include pictures of an Altavion barcode. Although the image of the barcode

language very much echoing Altavion's DST, Patent Application '035 (entitled "Method and Apparatus for Authenticating Printed Documents") describes how a printed document bearing an authentication barcode is self-authenticating because when scanned the document's contents may be "compared to the authentication data to determine if any part of the printed document has been altered since it was originally printed (i.e. whether the document is authentic) and what the alterations are. A printed document bearing authentication barcode is said to be self-authenticating because no information other than what is on the printed document is required to authenticate its content." Altavion's trade secrets 1B, 1C, and 2 relate to these processes.[18]

Accordingly, contrary to KMSL's assertions on appeal, the FSOD does identify particular DST design concepts that the trial court found were misappropriated.[19]

---

itself was not protectable because it had not been kept secret (see part IV.B.1., *post*), the inclusion of the image is circumstantial evidence that the more detailed information included in the patents and patent applications was obtained from Altavion.

[18] There is no indication the trial court found KMSL misappropriated trade secret 4, which is a method for processing forms, particularly test forms. Neither is there any indication the court found KMSL misappropriated trade secret 15, which involves Altavion's algorithm for generating a color barcode and highly technical details related to that process.

[19] KMSL asserts in its reply brief that the trade secrets discussed in Altavion's brief on appeal "differ from those presented at trial" because at various places Altavion cites to its Amended Identification (prepared during discovery to comply with Code Civ. Proc., § 2019.210), rather than to its Outline presented at the time of trial. (See part III.A., *ante*.) The Outline omits certain numbered trade secrets included in the Amended Identification and disclaims reliance on certain aspects of other secrets as a basis for Altavion's misappropriation claim. Nevertheless, the numbered trade secrets in the Outline otherwise correspond to the same numbered trade secrets in the Amended Identification, which includes a more detailed narrative regarding the alleged secrets than the Outline. KMSL does not attempt to demonstrate that any of the particular misappropriated trade secret concepts the trial court identified in the FSOD were not included in the Outline; neither does KMSL provide any citations to authority for its apparent suggestion that it is improper to refer to the Amended Identification to clarify the corresponding numbered trade secrets in the Outline. In light of the obvious correlation between the two documents, such a conclusion would be senseless in the present case.

23

4. *Conclusion Regarding Adequacy of the FSOD*

The degree of specificity required in the identification of misappropriated trade secrets in a statement of decision depends on the nature of the case. (See *Diodes*, *supra*, 260 Cal.App.2d at p. 253 ["[n]o more comprehensive rules for pleading can be generally enunciated because no inclusive definition of trade secrets is possible"]; *Burroughs Payment Systems, Inc. v. Symco Group, Inc.* (N.D.Cal., May 14, 2012, C-11-06268 JCS) 2012 WL 1670163, p. *14 ["question of whether a trade secret has been adequately identified depends, at least to some degree, upon the nature of the trade secret alleged"].) Ultimately, the trial court's specification needed to be clear enough to "fairly disclose" its determinations (*Central Valley General Hospital v. Smith*, *supra*, 162 Cal.App.4th at p. 513) and allow for meaningful review of its decision. Because the trial court found that KMSL misappropriated Altavion's DST concept as a whole, and also identified particular trade secret ideas that were misappropriated by KMSL in its patents and patent applications, the trade secret identification in the FSOD was adequate.[20]

IV. *Did Altavion's DST Design Concepts Constitute Protectable Trade Secrets?*

As noted previously, the UTSA defines a " '[t]rade secret' " as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

" 'Information' has a broad meaning under the [UTSA]." (Trade Secrets Practice in Cal., *supra*, § 1.4, p. 1-5; see also *Forro Precision, Inc. v. International Business*

---

[20] Although KMSL asserts broadly that insufficient evidence supports the court's misappropriation findings, KMSL only provides reasoned argument that Altavion's DST design concepts are not protectable as trade secrets as a matter of law, and that Altavion's DST concept had been disclosed to others (see part IV.B., *post*). KMSL does *not* present reasoned argument challenging the court's findings that KMSL's patents and patent applications incorporate aspects of the design concepts described in trade secrets 1B, 1C, 2, and 12.

*Machines Corp.* (9th Cir. 1982) 673 F.2d 1045, 1057.) "The definition of trade secret is . . . unlimited as to any particular class or kind of matter and may be contrasted with matter eligible for patent or copyright protection, which must fall into statutorily defined categories." (1 Milgrim on Trade Secrets (2013) Definitional Aspects, § 1.01, p. 1-4.) "[A] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device or list of customers [citations]." (*Sinclair v. Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216, 221, italics omitted.)

A. *Ideas Are Protectable as Trade Secrets.*

As explained below (part IV.B., *post*), the trade secret information at issue in the present case is principally comprised of the design concepts underlying Altavion's DST. In the words of the trial court, "the issue is whether [KMSL's] ideas set forth in the patents and patent applications are founded upon and disclose any trade secret 'ideas' [it] learned from [Altavion]." Because the trade secret information at issue in this case is a set of ideas rather than a set of products or specific formulae, it is important to address KMSL's assertion in its brief on appeal that "[g]eneralized ideas and inventions are protectable by patents and thus cannot be trade secrets."

Although KMSL fails to provide a citation for that assertion, KMSL proceeds to quote language in *Silvaco* drawing a distinction between patent law and trade secret law. *Silvaco* explained, "The sine qua non of a trade secret . . . is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret. This is the fundamental difference between a trade secret and a patent. A patent protects an *idea*, i.e., an invention, against appropriation by others. Trade secret law does not protect ideas as such. Indeed a trade secret may consist of something we would not ordinarily consider an *idea* (a conceptual datum) at all, but more a *fact* (an empirical datum), such as a customer's preferences, or the location of a mineral deposit. In either case, the trade secret is not the idea or fact itself, but

25

*information* tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only *the right to control the dissemination of information.*" (*Silvaco, supra*, 184 Cal.App.4th 210 at pp. 220-221.)[21]

In isolation, the statement "[t]rade secret law does not protect ideas as such" (*Silvaco*, *supra*, 184 Cal.App.4th at p. 220) is easily misunderstood. In fact, *Silvaco* plainly does *not* hold that secret ideas are not protectable under trade secret law, and KMSL cites no authority for its apparent claim that the definition of "information" in section 3426.1, subdivision (d), excludes patentable ideas. The court in *Sinclair v. Aquarius Electronics, Inc.*, *supra*, 42 Cal.App.3d 216, explained the overlap between trade secret law and patent law as follows: "[A]lthough a trade secret may be a device or process which is patentable, patentability is not a condition precedent to the classification of a trade secret. Thus, it has been said that a trade secret may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement on a machine or device. Novelty and invention are not requisite for a trade secret as they are for patentability [citation]. In harmony with these precepts, it has been held that *a trade secret in the broad sense consists of any unpatented idea which may be used for industrial and commercial purposes* [citation]." (*Id.* at p. 222, italics added, citing *Painton & Company v. Bourns, Inc.* (2d Cir. 1971) 442 F.2d 216, 222; accord, *Rigging Internat. Maintenance Co. v. Gwin* (1982) 128 Cal.App.3d 594, 613; see also *Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470, 491 ["extension of trade secret protection to clearly patentable inventions does not conflict with the patent policy of disclosure"]; *Sketchley v. Lipkin* (1950) 99 Cal.App.2d 849, 854 ["owner of an unpatented device is by legal principles protected against the piracy of his invention

---

[21] Because the nature of the intellectual property protected by patent and trade secret law is different, the legal protections are different as well. As explained in *Cadence Design Systems, Inc. v. Avant! Corp.*, *supra*, 29 Cal.4th at page 222, "the patent owner acquires a limited term monopoly over the patented technology, and use of that technology by whatever means infringes the patent. The owner of the trade secret is protected only against the appropriation of the secret by improper means and the subsequent use or disclosure of the improperly acquired secret. There are various legitimate means, such as reverse engineering, by which a trade secret can be acquired and used. [Citation.]"

26

because it is his own by virtue of being the original product of his mind"]; *AvidAir Helicopter Supply, Inc. v. Rolls-Royce* (8th Cir. 2011) 663 F.3d 966, 973 ["[t]rade secret protection does not shield an idea from 'infringing' other uses of the idea; instead it protects valuable information from being misappropriated despite reasonable efforts to keep it secret"]; *Gabriel Technologies Corp. v. Qualcomm, Inc.* (S.D.Cal., Dec. 12, 2011, 08CV1992 AJB MDD) 2011 WL 6152240, p. *5 [court agreed that "a unique approach to a problem can constitute a process that is a protectable trade secret provided that the approach process is sufficiently described"].)[22]

An inventor who fails to obtain a patent for a patentable idea incurs significant risks. The secret may leak, or other circumstances may arise that frustrate the inventor's right to obtain a patent. (*Kewanee Oil Co. v. Bicron Corp., supra,* 416 U.S. at p. 490; *Painton & Company v. Bourns, Inc.*, *supra*, 442 F.2d at p. 224.) Nevertheless, the "long-standing principle" is "that an inventor who chooses to exploit his invention by private arrangements is entirely free to do so, though in so doing he may thereby forfeit his right to a patent." (*Painton & Company*, at p. 225; see also *ibid.* ["inventor 'may keep his invention secret and reap its fruits indefinitely' "]; *Sinclair v. Aquarius Electronics, Inc.*, *supra*, 42 Cal.App.3d at p. 223 ["although a trade secret does not give its owner any monopoly and once contracted away is subject to being copied, the inventor is entirely free to keep his idea secret and not to divulge it to the general public"]; *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.* (7th Cir. 2003) 342 F.3d 714, 727 (*Learning Curve*) [stating it is "irrelevant that [PlayWood] did not seek to patent its concept"].) Indeed, as a leading scholar has observed, because a "substantial number of patents" are invalidated by the courts, resulting in disclosure of an invention to competitors with no benefit,

---

[22] Although a secret idea need not be patentable to qualify for trade secret protection (see *Sinclair v. Aquarius Electronics, Inc.*, *supra*, 42 Cal.App.3d at p. 222 ["[n]ovelty and invention are not requisite for a trade secret as they are for patentability"]; see also *Yield Dynamics, supra,* 154 Cal.App.4th at p. 562; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 82, p. 377), "[i]f an invention has sufficient novelty to be entitled to patent protection, it may be said *a fortiori* to be entitled to protection as a trade secret." (1 Milgrim on Trade Secrets, *supra*, § 1.08[1], p. 1-468.69, fns. omitted.)

27

"many businesses now elect to protect commercially valuable information through reliance upon the state law of trade secret protection." (1 Milgrim on Trade Secrets, *supra*, § 1.01[2][a], p. 1-36.)[23]

In conclusion, it is clear that if a patentable idea is kept secret, the idea itself can constitute information protectable by trade secret law. In that situation, trade secret law protects the inventor's "*right to control the dissemination of information*" (*Silvaco, supra*, 184 Cal.4th at p. 221)—the information being the idea itself—rather than the subsequent use of the novel technology, which is protected by patent law (*Cadence Design Systems, Inc. v. Avant! Corp.*, *supra*, 29 Cal.4th at p. 222). In other words, trade secret law may be used to sanction the misappropriation of an idea the plaintiff kept secret. (See, e.g., *Learning Curve*, *supra*, 342 F.3d at p. 721 [misappropriation of "concept" for noise-producing toy railroad track]; *Contour Design, Inc. v. Chance Mold Steel Co.* (D.N.H., Jan. 14, 2010, 09-CV-451-JL) 2010 WL 174315 [misappropriation of ergonomic mouse "concept"].) This is consistent with the proposition that "The sine qua non of a trade secret . . . is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret." (*Silvaco*, at p. 220)

---

[23]  See also, e.g., Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, *supra*, 61 Stan. L.Rev. at p. 313 ("while we have other laws that encourage inventions, notably patent law, trade secrecy offers some significant advantages for inventors over patent protection"); *id.* at pp. 331, 338-339; Halligan, *Protecting U.S. Trade Secret Assets in the 21st Century* (Sept./Oct. 2013) Westlaw, 6 No. 1 Landslide 12, p. *13 ("Recent judicial decisions in patent law have weakened patent protection. In contrast, trade secrets have flourished with broad protection and expansive remedies for trade secret misappropriation under U.S. law."); Schwartz, *The Corporate Preference for Trade Secret* (2013) 74 Ohio St. L.J. 623, 624, fns. omitted ("A new invention can often be legally protected in one of two ways, patent or trade secret. So, which to choose? The choice is important, as each method has its strengths and weaknesses. Patents offer strong protection and a positive 'signal' to outsiders, but they are costly, require extensive disclosure and expire after twenty years. Trade secret offers weak protection, as it provides no defense against reverse engineering or independent invention, but it costs nothing to obtain, avoids disclosure and can last forever.").

B. *Design Concepts Underlying Altavion's DST Constitute Protectable "Information."*

As explained in greater detail *post*, the information at issue in the present case can readily be divided into three tiers of specificity and secrecy. The least specific and least secret level of information is Altavion's general idea for a barcode allowing for self-authentication of documents with identification of alterations. This level of information is not a protectable trade secret because the general idea was disclosed to other companies without the benefit of an NDA. At the other extreme, the most specific and secret level of information is Altavion's algorithms and source code that execute Altavion's DST.[24] Such information is unquestionably protectable by trade secret law, but it could not form the basis for Altavion's misappropriation claim because Altavion did not share its algorithms and source codes with KMSL.

The middle tier of information is comprised of the design concepts that underlie Altavion's DST, many of which might be evident to a software end user. There is no evidence such information was disclosed to anyone other than KMSL, pursuant to an NDA, and, thus, misappropriation of these secret design concepts (separately and in combination) provide a basis for Altavion's claim.

1. *Altavion's General DST Idea Was Not Secret.*

Secrecy is an essential characteristic of information that is protectable as a trade secret. (*Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1002; *DVD Copy Control*, *supra*, 31 Cal.4th at p. 881; *Silvaco*, *supra*, 184 Cal.App.4th at pp. 220-221; see also Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, *supra*, 61 Stan. L.Rev. at pp. 342-344.) KMSL contends Altavion failed to show it made "reasonable" efforts (§ 3426.1, subd. (d)(2)) to protect the secrecy of its purported trade secrets

---

[24] "Computer software programs are written in specialized languages called source code. The source code, which humans can read, is then translated into language that computers can read. The computer readable form, which operates on a binary system, is called object code." (*Cadence Design Systems, Inc. v. Avant! Corp.*, *supra*, 29 Cal.4th at p. 218, fn. 3; see also *DVD Copy Control*, *supra*, 31 Cal.4th at p. 872, fn. 2; *Silvaco*, *supra*, 184 Cal.App.4th at pp. 217-218 & fn. 4.)

because Altavion disclosed its secrets to others without the protection of an NDA. It is well established that " '[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.' " (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 304, quoting *Ruckelshaus*, at p. 1002; see also *DVD Copy Control*, at p. 881.) KMSL points to evidence it argues demonstrates that Altavion disclosed its DST concept to several entities without assurances of confidentiality. It asserts, "Altavion did not treat 'DST' or its 'digital stamping technology' as a secret or confidential—to the contrary, it showed it to anyone who might be interested in doing business with Altavion." We conclude the evidence of disclosure does not undermine the trial court's finding that Altavion made reasonable efforts to maintain the secrecy of its DST, because the evidence shows Altavion disclosed only its *general* DST concept, not the underlying design details.

The first disclosure of Altavion's general DST concept involved a demonstration by Altavion of its black and white barcode in Saudia Arabia to the Saudi Chamber of Commerce in September 2002. Altavion did not have an NDA with that group. Moussa testified he demonstrated document authorization with a black and white stamp as embodied in trade secret 1A. Trade secret 1A, which is a method for "captur[ing] document text as it is being created in real-time and encod[ing] it into a barcode," was not one of the secrets for which Altavion claimed misappropriation at trial. Moreover, Moussa testified he demonstrated the creation of a barcode using this method, but he never explained how it was done or "the details of doing it."

The second disclosure of Altavion's general DST concept involved a June 2003 demonstration by Altavion to KMSL of "paper stamp software" embodying trade secrets 1C, 4, and 12. Altavion and KMSL had not yet executed an NDA. But Moussa explained that the software demonstration showed the results of the process, but not the steps or details of how to make the stamp. He explained it "was just to show to them results rather than to explain details. . . . And that is needed when you sell something, otherwise you will continue to keep it for yourself and not being [*sic*] able to sell

30

anything." He further explained that confidential information for Altavion "means the details of making things to work. . . . [Y]ou have to show other people as well on the surface what we have so that at least you attracted the attention for possible relationships. So, these things which appears on the surface is not confidential. I've showed you . . . a picture . . . . The picture itself is the result of applying that trade secret for it to appear. If people are interested in that picture, then we are more than happy to sit down and have an agreement with them and start to explain what we have, if it will lead to commercial[ly] beneficial . . . relationships."

The third disclosure of Altavion's general DST concept occurred when a salesperson named Phil Thoren made a presentation to testing company Harcourt Educational Measurement regarding Altavion's DST, apparently without an NDA. Moussa admitted the presentation was based on information obtained from Altavion, but he denied authorizing the presentation. The presentation to Harcourt stated that "Document Stamping is a mechanism to bind the content, physical and digital signatures and user authentication in both electronic file and paper form." The presentation described the size of the stamp; that the stamp contains a time stamp, image metadata, and a digital signature; and that the stamp "Detects any change" with "Single Pixel resolution @ 8 bit grayscale color depth." As noted previously, there is no indication the trial court found that KMSL misappropriated trade secret 4, which related to the application of DST to test forms. (See fn. 18, *ante*.)

In the fourth disclosure of Altavion's general DST concept, Moussa, in June 2005, sent Microsoft a presentation about Altavion's DST without the protection of an NDA. The presentation described Altavion's process for producing "[s]elf-[a]uthenticated [d]ocuments" with the ability to detect and identify alterations. A page captioned "What is Inside a Stamp?" contained an image of an Altavion barcode on a document, a blown-up image of the barcode, and an indication that the barcode contained "[d]ocument metadata" and "[a]dministrative [d]ata," with examples of types of administrative data, such as a time stamp or an account number.

31

Finally, in May 2006, Moussa e-mailed a presentation regarding Altavion's DST to Wachovia Bank without the protection of an NDA. Moussa testified the presentation showed images of Altavion's barcode on documents, and a "[g]lobal view of what the barcode will contain." The presentation also asserted the barcode would permit alterations to be detected and identified.

Thus, the evidence in the record demonstrates that, although Altavion disclosed to several entities its general concept for implementation of DST, it did not provide details about the design concepts underlying its DST, much less provide demonstration software as it did to KMSL. Accordingly, although Altavion could not base its misappropriation claim on its *general* DST concept, Altavion's disclosures did not preclude a determination that the *design concepts underlying* Altavion's general DST concept are protectable trade secrets.

2. *Design Concepts Underlying Altavion's DST Are Protectable.*

The two other levels of information arguably at issue in the present case are the most secret level—Altavion's algorithms and source code—and the middle tier of information, comprised of the design concepts underlying Altavion's DST. The record shows Altavion did not disclose those levels of information to other companies. The record also shows that, although it is well-established that source code can constitute a protectable trade secret (see, e.g., *Cadence Design Systems, Inc. v. Avant! Corp.*, *supra*, 29 Cal.4th at p. 219; *Silvaco*, *supra*, 184 Cal.App.4th at pp. 221-222), Altavion did *not* disclose its source code and algorithms to KMSL. Accordingly, the information at issue in the present case is the *design concepts underlying* Altavion's DST, which Altavion kept secret from other companies but indisputably disclosed to KMSL subject to an NDA.[25]

KMSL argues Altavion's DST design concepts are not protectable trade secrets, characterizing *Silvaco*, *supra*, 184 Cal.App.4th at pages 221-222, as standing for the

_____

[25] As explained in part V., *post*, in fashioning its damages award, the trial court took into consideration that KMSL misappropriated the design concepts underlying Altavion's DST but not the source code itself.

32

proposition that "although a finished product might have distinctive characteristics resulting from a specific design, those characteristics cannot constitute trade secrets." KMSL is mistaken. *Silvaco* merely held that the design of a software program is not a trade secret *to the extent the design elements are disclosed and evident to the end user*. The plaintiff in that case, Silvaco, was the developer of software used to design electronic circuits and systems. (*Id.* at p. 216.) Silvaco filed suit against the defendant Intel, alleging Intel had misappropriated certain trade secrets used by Silvaco in its software. (*Ibid.*) "The primary gist of the claims was that Intel had used software acquired from another software concern with knowledge that Silvaco had accused that concern of incorporating source code, stolen from Silvaco, in its products." (*Id.* at pp. 215-216.) The main issue in the case was whether Intel could be liable for misappropriation of Silvaco's source code where it never had access to the actual source code. (*Id.* at p. 220.) As relevant to the present case, *Silvaco* also held that one category of purported trade secrets—described as "various features, functions, and characteristics of the design and operation of Silvaco's software products"—did not include trade secrets at all. (*Id.* at p. 221.) That was because those software design concepts ceased to be protectable trade secrets to the extent the finished program disclosed the underlying design. (*Id.* at p. 222.) As *Silvaco* explained, "The design may constitute the *basis* for a trade secret, such that *information concerning it* could be actionably misappropriated; but it is the information—not the design itself—that must form the basis for the cause of action. And while the finished (compiled) product might have distinctive characteristics resulting from that design—such as improved performance—they cannot constitute trade secrets because they are not secret, but are evident to anyone running the finished program." (*Id.* at pp. 221-222.)

Thus, *Silvaco* makes a distinction between source code and software design concepts, concluding design concepts are not protected by trade secret law where they can be ascertained by the end software user. A California federal district court summarized *Silvaco* on this issue as follows: "Plans, flows, inputs, outputs, rules of operation, priorities of operation, and the like are not trade secrets to the extent they are

33

manifest in the way a program works.  [Citation.]  In other words, background information comprising, for example, the features and functions, the business requirements and the high level design specifications that are incorporated into software and are evident in the operation of the software are not trade secrets.  While source code is undoubtedly a trade secret, the way the source code *works* when compiled and run is not." (*Agency Solutions.Com, LLC v. TriZetto Group, Inc., supra,* 819 F.Supp.2d at p. 1017; see also *id.* at pp. 1019-1021 [following *Silvaco* in rejecting claims that software workflow processes that would be apparent to users are trade secrets]; *IDX Systems Corp. v. Epic Systems Corp., supra,* 285 F.3d at p. 584 ["details that ordinary users of the software could observe" are not trade secrets]; *LinkCo, Inc. v. Fujitsu Ltd.* (S.D.N.Y. 2002) 230 F.Supp.2d 492, 499 [holding, as a matter of law, that the plaintiff had not established the existence of a trade secret where the alleged secret was only the "software architecture," which "cannot remain secret once it is marketed"].)

Although *Silvaco* supports the proposition that *disclosed* software design concepts are not trade secrets, "A potent distinction exists between a trade secret which *will* be disclosed if and when the product in which it is embodied is placed on sale, and a 'trade secret' embodied in a product which has been placed on sale, which product admits of discovery of the 'secret' upon inspection, analysis, or reverse engineering." (1 Milgrim on Trade Secrets, *supra*, § 1.05[4], p. 1-338.1; accord, *Learning Curve*, *supra*, 342 F.3d at p. 729.)  Consistent with that proposition, cases have extended trade secret protection to computer programs and aspects of computer programs that the plaintiffs kept confidential.  For example, in *Integrated Cash Mgmt. Serv. v. Digital Transactions*, *supra*, 920 F.2d 171, the plaintiff alleged that former employees misappropriated the design and " 'architecture' " of the plaintiff's computer programs in creating a program for another company.  (*Id.* at p. 172.)  The appellate court extended trade secret protection to "the manner in which several non-secret utility programs are arranged to create" the plaintiff's "computer software product."  (*Id.* at p. 171.)  The court noted that the manner in which plaintiff's programs interacted was not generally known or readily ascertainable, and that the combination of programs "was not disclosed in [the plaintiff's]

34

promotional literature, which contains merely a user-oriented description of the advantages of [the plaintiff's] product." (*Id.* at p. 174.)

Similarly, in *Burroughs Payment Systems, Inc. v. Symco Group, Inc.*, *supra*, 2012 WL 1670163, the claims involved the plaintiff's check processing business and "password protected diagnostic software that is stored on scanning equipment provided by" the plaintiff to customers. (*Id.* at p. *1) The plaintiff alleged the defendant, a competitor, had used the diagnostic software in servicing the plaintiff's customers' equipment. (*Ibid.*) Applying California's UTSA, the federal district court held the plaintiff had properly alleged the existence of a trade secret because "the trade secrets at issue are not by necessity available to the public once the software (or the equipment containing it) is placed on the market; rather they can only be accessed by authorized individuals by entering a password." (*Id.* at p. *15) The court characterized the alleged trade secrets as the improperly accessed "materials and screen images . . . rather than the source code." (*Id.* at p. *16; see also *Rivendell Forest Products v. Georgia-Pacific*, *supra*, 28 F.3d at p. 1046 [extending trade secret protection to "combination of concepts and ideas" implementing the plaintiff's customer service software system]; *AirWatch LLC v. Mobile Iron, Inc.* (N.D.Ga., Sept. 4, 2013, 1:12-CV-3571-JEC) 2013 WL 4757491, pp. *3-*4 [distinguishing *Silvaco*, rejecting contention that only underlying "source code" protectable, and concluding that software functions and specifications were potentially protectable where the plaintiff allegedly required licensees to sign confidentiality agreements]; *Dickerman Associates v. Tiverton Bottled Gas* (D.Mass. 1984) 594 F.Supp. 30, 35 ["[T]he particular combination of procedures used in [the] plaintiff's [computer] system, and the particular features within the system . . . are neither obvious nor easily duplicated. They constitute a trade secret."].)

In the present case, although the trial court extended trade secret protection to design concepts analogous to those at issue in *Silvaco*, we conclude *Silvaco* does not preclude Altavion's misappropriation claim because the evidence shows that Altavion did not disclose its DST design concepts to anyone other than KMSL, and the disclosure to KMSL was subject to an NDA.

C. *Substantial Evidence Supports The Trial Court's Finding Altavion's DST Design Concepts Had Independent Economic Value.*

To be protectable as a trade secret, the information at issue must "[d]erive[] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." (§ 3426.1, subd. (d)(1).) In other words, the information alleged to be a trade secret "is valuable because it is unknown to others." (*DVD Copy Control Assn. v. Bunner* (2004) 116 Cal.App.4th 241, 251.) Thus, the focus of the inquiry regarding the independent economic value element is "on whether the information is generally known to or readily ascertainable by business competitors or others to whom the information would have some economic value. [Citation.] Information that is readily ascertainable by a business competitor derives no independent value from not being generally known. [Citation.]" (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1172; see also Trade Secrets Practice in Cal., *supra*, § 1.7, pp. 1-11 to 1-12.) The information must be " 'sufficiently valuable . . . to afford an . . . economic advantage over others.' [Citation.]" (*Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 565.) The actual or potential advantage " 'need not be great,' " but it must be " 'more than trivial.' " (*Id.*, at p. 564; but see *Morlife*, *supra*, 56 Cal.App.4th at p. 1522 [secrecy of information provides a " 'substantial business advantage' "].)[26]

It was Altavion's burden to show independent economic value. (*Yield Dynamics*, *supra*, 154 Cal.App.4th at pp. 562-563.) "The value of information claimed as a trade

---

[26] *Yield Dynamics* quotes the language of and the commentary to the Restatement Third of Unfair Competition (*Yield Dynamics*, *supra*, 154 Cal.App.4th at pp. 564-565), which defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." (Rest.3d Unfair Competition, § 39, p. 425.) Although the UTSA definition differs, the Restatement and its commentary is relevant authority in applying the UTSA. (See *Vacco Industries, Inc. v. Van Den Berg, supra,* 5 Cal.App.4th at p. 50 ["[b]y its adoption of the [UTSA], California effectively adopted the common law definition" of a trade secret]; Trade Secrets Practice in Cal., *supra*, § 1.7, p. 1-11 [independent economic advantage element "is a codification of the common law requirement that a trade secret reflect a 'competitive advantage' "].)

secret may be established by direct or circumstantial evidence. Direct evidence relating to the content of the secret and its impact on business operations is clearly relevant. Circumstantial evidence of value is also relevant, including the amount of resources invested by the plaintiff in the production of the information, the precautions taken by the plaintiff to protect the secrecy of the information . . . , and the willingness of others to pay for access to the information." (Rest.3d Unfair Competition, § 39, com. e, p. 431; accord, *Religious Technology Center v. Netcom On-Line Com.* (N.D.Cal. 1995) 923 F.Supp. 1231, 1253.)

KMSL argues Altavion did not show that any of its trade secrets were not generally known. We disagree. As explained in part IV.B., *ante*, the evidence showed that Altavion kept secret all but the most general idea for its DST. Moussa testified he was not aware of any barcodes in existence when he started Altavion in 2002 that could hold the desired amount of data, he was not aware of other barcodes that allowed for the creation of self-authenticating documents, and Altavion invented its unique implementation of color reference cells. Moreover, the trial court could reasonably infer Altavion's DST was not generally known or readily ascertainable from Moussa's testimony regarding the company's investment in developing the technology. The court could also make that inference based on KMSL's internal documents extolling the novelty of Altavion's DST. Finally, the trial court could reasonably infer that Altavion's DST was not generally known from the fact that KMSL obtained patents based on the technology (see part III.B.3., *ante*). The Patent Act provides for issuance of a patent to a person who "invents or discovers any new and useful . . . composition of matter, or any new and useful improvement thereof." (35 U.S.C. § 101; see also *Bilski v. Kappos* (2010) 561 U.S. ___ [130 S.Ct. 3218, 3225].) Thus, where a party obtains a patent based on information claimed to be a trade secret, the fact of the patent itself is some evidence showing the information was not generally known.[27]

---

[27] The factual summary portion of KMSL's opening brief on appeal includes various references to a 2003 patent assigned to a competitor, Canon Inc., that employs an "authentication code . . . to prevent the unauthorized editing" of a printed document. For

37

KMSL also argues there was no evidence supporting the trial court's finding that Altavion's DST had potential economic value. Revealingly, KMSL does not make any serious effort to argue that advancements in DST in general, or Altavion's advancements in particular, lack inherent economic value. Any such contention would be belied by the serious interest KMSL showed in Altavion's DST and the effort KMSL put into obtaining patents covering Altavion's DST. On this issue, the trial court stated, "That it has at least 'potential' 'economic value' is demonstrated by the fact that [KMSL] engaged in filing multiple patent applications on bar code technology after learning from [Altavion]." (See *Enterprise Mfg. Co. v. Shakespeare Co.* (6th Cir. 1944) 141 F.2d 916, 920 ["The argument of appellee that the improvement disclosed in the patent under consideration was without value, or of only nominal value, was rightly rejected. The appellee, by infringing use, has paid tribute to the utility of the device infringed."].) We agree this is relevant circumstantial evidence of value, and KMSL cites to no contrary authority. The patents themselves have some potential value to KMSL, both because they protect the company's use of the DST described therein and because KMSL could charge others for a license to make use of the DST.[28]

Furthermore, there is evidence Altavion invested substantial time and effort in developing its DST. In particular, Moussa testified Altavion's eight to ten software engineers developed the black and white document authentication barcode over a period of four or five months, starting in February 2002, and the company finished development of the color barcode in December 2002 or January 2003. There was also evidence KMSL paid Altavion $50,000 for evaluation software; invested staff time in trying to develop a deal with Altavion; and devoted resources to analyzing the Altavion software in order to

the first time in its reply brief, KMSL asserts the Canon patent shows the concepts involved in Altavion's DST were generally known. The contention has been forfeited. (*Loranger v. Jones* (2010) 184 Cal.App.4th 847, 858, fn. 9.) In any event, substantial evidence in the record supports a finding the process described in the Canon patent is distinguishable from Altavion's DST.

[28] As the trial court pointed out, Altavion's expert testified that KMSL's patents could prevent Altavion from proceeding with sale or licensing of Altavion's own DST.

develop its own DST that would, in the words of Cattrone, achieve "Altavion'esque" results. All of these investments of resources support the court's finding. (See *Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278, 1287 [holding that "a customer list procured by substantial time, effort, and expense is a protectable trade secret"]; accord, *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1020; see also *Mattel, Inc. v. MGA Entertainment, Inc.* (C.D.Cal. 2011) 782 F.Supp.2d 911, 972 ["[i]ndependent economic value can be evidenced by 'circumstantial evidence of the resources invested in producing the information' "]; cf *Learning Curve*, *supra*, 342 F.3d at p. 728 [although "significant expenditure of time and/or money in the production of information may provide evidence of value," it is not required].) Finally, Moussa's secrecy (see part IV.B., *ante*) regarding the details of Altavion's DST reflects Moussa's own assessment of the information's value, which further supports the trial court's finding. (See *Morlife*, *supra*, 56 Cal.App.4th at p. 1522 [a company's effort to maintain the secrecy of information is "an important factor in establishing the value which was placed on the information and that it could not be readily derived from publicly available sources"].)

Finally, there was evidence before the trial court that, if successfully implemented, DST could be very lucrative because of potential applications in many different industries. A June 2005 marketing consultant's report prepared for KMSL emphasized the worldwide impacts of document fraud and discussed the potential to apply document authentication methods in trade, national security, immigration, government documentation, pharmaceutical, casino, and a range of other industries and contexts. It stated there was a need to develop "new methods of document authenticity" to address the problem of easy digital manipulation of documents. Former Minolta Business Solutions salesman Zivic testified he thought the "pay-per-scan" concept using Altavion's DST was a "remarkable opportunity" that provided a "very unique differentiator among all copier manufacturers." He also referred to the Altavion deal as the "biggest opportunity" he had ever worked on, because the technology had the potential to earn vast sums on check scanning in the banking industry.

Although the trial court found it is "disputed whether [Altavion's DST] actually works in the physical world, as opposed to in theory or only in the digital world," the long-term lucrative potential of DST supports a finding that the incremental advancements in the field represented by the concepts misappropriated by KMSL have independent economic value. In particular, the fact that Altavion's DST is not incorporated into a product on the market does not preclude a finding of independent economic value. (See § 3426.1, subd. (d)(1) ["potential" value]; 1 Milgrim on Trade Secrets, *supra*, § 1.01[2][a], p. 1-47 [quoting commentary to UTSA that "[t]he broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use"]; see also *Leatt Corp. v. Innovative Safety Technology, LLC* (S.D.Cal., Apr. 15, 2010, 09-CV-1301-IEG (POR)) 2010 WL 1526382, p. *5 [design features of neck safety brace prototype have independent economic value].) A concept can have enough value to justify trade secret protection even if further refinement and development is required before a product based on the concept can be brought to market. (*Learning Curve*, *supra*, 342 F.3d at p. 726; see also *Mattel, Inc. v. MGA Entertainment, Inc.*, *supra*, 782 F.Supp.2d at p. 962 ["[c]oncepts can have value independent from the product they eventually inspire"].) For the same reasons, the fact that KMSL did not misappropriate the DST source code did not preclude a finding that Altavion's DST concept had independent value.

All of the above analysis on the independent economic value element is applicable to both Altavion's DST viewed as a protectable combination of elements and to the previously identified specific design concepts underlying Altavion's DST. (See part III.B., *ante*.) Regarding the misappropriated design concepts, because those concepts represented the heart of Altavion's DST concept as a whole, it was reasonable for the trial court to infer that the potential economic value was ascribable to those elements. Substantial evidence supports the court's finding that Altavion showed its alleged trade secrets had independent economic value.

D. *Conclusion Regarding Merits of Misappropriation Claim*

The trial court's finding that KMSL misappropriated Altavion's trade secrets is amply supported by the evidence in the record and the relevant legal authorities. As Altavion sought to commercialize its innovative DST with the assistance of KMSL, to the expected mutual benefit of both companies (and society as a whole, had a marketable product been achieved), Altavion was entitled to the protections afforded by trade secret law alluded to at the beginning of this opinion. When KMSL secretly filed patent applications disclosing Altavion's ideas, and subsequently obtained patents covering Altavion's ideas, it was a classic violation of trade secret law. The trial court did not err in its misappropriation finding.

V. *Trial Court's Damages Award*

The UTSA authorizes compensatory damages (1) "for the actual loss caused by misappropriation"; (2) "for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss"; and (3) if "neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty." (§ 3426.3, subds. (a) & (b); *Ajaxo Inc. v. E\*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295, 1308-1309, 1312-1313 (*Ajaxo*); see also *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*, *supra*, 171 Cal.App.4th at p. 954; *Morlife*, *supra*, 56 Cal.App.4th at p. 1529; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628.) KMSL contends the trial court improperly "tailor[ed] a new category of damages to fit Altavion." As explained below, the trial court properly based its damages award on the reasonable royalty measure of damages.

Altavion conceded during its opening statement that it could not prove it had actual damages, and the trial court found Altavion had not proven any actual loss. The court reasoned, "The evidence that [Altavion] would have a working software product embedded in [KMSL's] hardware machines, and successfully sold for years at a profit, under the circumstances, is highly speculative and uncertain, and the revenue projections are unreliable."

Regarding unjust enrichment, the trial court noted that, although Altavion had not argued for that measure of damages, section 3426.3 required the court to consider whether such damages were provable. The court quoted *Ajaxo, supra,* 187 Cal.App.4th at page 1313, which held "that where a defendant has not realized a profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust enrichment is not provable within the meaning of section 3426.3, subdivision (b), whether the lack of benefit is determined as a matter of law or as a matter of fact." The trial court then suggested there was no such evidence of a calculable benefit in the present case, reasoning that KMSL "did not incorporate [Altavion's] trade secrets into any of its [MFP] products, or create a software that it sells or licenses, or otherwise commercially exploit the secrets. [KMSL has] made no profits from [Altavion's] trade secrets or its misappropriation." The court also pointed out that KMSL did not misappropriate Altavion's DST source code or algorithms, which were Altavion's "core" trade secret.

The trial court then acknowledged the next step was to determine whether a reasonable royalties award was appropriate, quoting *Ajaxo*, *supra*, 187 Cal.App.4th 1295, for the propositions that "where the defendant does not make any profit, reasonable royalties could be awarded" (*id*. at p. 1312) and "[w]hen calculating a monetary remedy for the past use of a misappropriated trade secret, a court 'may order' reasonable royalties '[i]f neither damages for actual loss nor unjust enrichment caused by misappropriation are provable' " (*id*. at p. 1308). The court then quoted extensively from *Ajaxo* and other authorities regarding the standards for determining the amount of a reasonable royalty.

Ultimately, the court found, "whether properly characterized as unjust enrichment or (because [KMSL] made no profit and the exact amount of the value or benefit to [KMSL] is not easily subject to calculation) as reasonable royalties, the [c]ourt would award the same amount of damages." The court proceeded to list a number of circumstances that it had considered, "including but not limited to the fact that [KMSL has] not used the trade secrets in any product; [KMSL does] not presently have any viable software to produce a DST for Closed Loop or for self-authentication; [KMSL]

42

attempted to obtain the trade secrets of [Altavion] without having to pay for them . . . and when this did not occur [KMSL] attempted to create its own DST technology by piggy-backing upon all of the DST knowledge and information [KMSL] had received from [Altavion]; that [KMSL] expended [its] own resources thereafter to try and develop the DST technology . . . but were unable to actually achieve Closed Loop results or achieve DST matching that of [Altavion]; that [Altavion] spent years developing its technology at its own expense; that the parties discussed development of an SDK or other means by which [Altavion] would further develop its DST technology to be used for Closed Loop, at a price range of $400,000 to $500,000, and then potentially entered into a commercial agreement to sell a product together with revenue sharing of some sort; that [KMSL's] expert opined that the R&D costs incurred by [Altavion] for the DST were approximately $660,000, and would be approximately $1.2 million if it included the unpaid 'salary' of Moussa; that the unpaid 'salary' of Moussa was . . . not an amount negotiated at arm's length; that the Altavion records internally regarding financials and technology and externally regarding the communications and transactions between the parties are not reliable or are incomplete; that [Altavion] still retains its core trade secret(s); and that there is presently no market for [Altavion's] technology or for [KMSL's] patented DST ideas." The court awarded Altavion damages of $1 million, "as the equitable value of the trade secrets misappropriated at the time of the misappropriation commencing in late June 2004." The court also awarded prejudgment interest.

KMSL argues the trial court "ventured into uncharted waters, selecting 'none of the above' as the measure of damages . . . and awarding Altavion $1 million 'as the equitable value of the trade secrets misappropriated.' " KMSL mischaracterizes the court's decision. The court did not conclude none of the statutory measures of damages were applicable. Instead, the trial court expressly found the amount of Altavion's actual loss was unprovable, suggested the amount of KMSL's unjust enrichment was also unprovable, and found $1 million was a reasonable royalty. Although the court did not make an express finding about unjust enrichment, that measure of damages is unprovable "where a defendant has not realized a profit or other calculable benefit as a result of his

43

or her misappropriation of a trade secret." (*Ajaxo*, *supra*, 187 Cal.App.4th at p. 1313.)  In the circumstances of the present case, the court's finding that KMSL did not make any profits from or otherwise commercialize Altavion's trade secrets is properly understood as a finding that the amount of unjust enrichment was unprovable.

Contrary to KMSL's argument on appeal, the trial court unequivocally concluded that $1 million was a reasonable royalty for the misappropriated trade secrets.  The trial court's reference to the "equitable value" of the misappropriated secrets appears to be due to the origin of the reasonable royalty measure of damages in equitable principles.  (See *Ajaxo*, *supra*, 187 Cal.App.4th at p. 1310; *University Computing Co. v. Lykes-Youngstown Corp.* (5th Cir. 1974) 504 F.2d 518, 536-537.)  *University Computing* quoted an earlier decision explaining, " 'To adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and then to determine what the license price should have been.  In effect, the court assumes the existence *ab initio* of, and declares the *equitable* terms of, a supposititious license, and does this *nunc pro tunc*; it creates and applies retrospectively a compulsory license. . . .' " (*University Computing*, at p. 537, second italics added.)  KMSL's assertion that the trial court "invented a theory outside the statute" is meritless.

Furthermore, although KMSL asserts "there is no basis for a royalty award," KMSL does not actually provide any reasoned argument on that issue with citations to the record and supporting authority.  (*Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785.)  That is, KMSL does not address the specific evidence cited by the trial court in justifying its damages award and explain why that evidence was insufficient to support the award under the reasonable royalties measure of damages.  KMSL has failed to establish a basis to reverse the trial court's damages award.

VI.  *Trial Court's Award of Prejudgment Interest*

The trial court found $1 million was the value of the misappropriated trade secrets "at the time of the misappropriation commencing in late June 2004" and awarded

44

"prejudgment simple interest of 7 [percent] per annum" from that date. KMSL contends the trial court erred in awarding prejudgment interest.

Section 3288 provided the trial court discretion to award prejudgment interest.[29] (*Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 102 (*Greater Westchester*); *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1586-1587.) An award of prejudgment interest is " 'awarded to compensate a party for the loss of his or her *property*.' [Citations] The award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss. Using recognized and established techniques a fact finder can usually compute with fair accuracy the interest on a specific sum of money, or on property subject to specific valuation. Furthermore, the date of loss of the property is usually ascertainable, thus permitting an accurate interest computation." (*Greater Westchester*, at pp. 102-103.) The underlying theory is that " '[a]n individual who must litigate to recover damages should be placed in the same position, when he recovers, as the individual who recovered the day he suffered an injury. Otherwise, the tortfeasor benefits from denying liability and continuing to litigate, while he retains the use of money to which the plaintiff is entitled, and the plaintiff is deprived of the benefit he should have derived from an immediate recovery.' " (*Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 526; see also *In re Pago Pago Aircrash of January 30, 1974* (C.D.Cal. 1981) 525 F.Supp. 1007, 1013-1014.)

Citing *Greater Westchester*, KMSL contends the trial court's award of prejudgment interest was improper because the amount KMSL owed Altavion was not readily ascertainable. In *Greater Westchester*, *supra*, 26 Cal.3d 86, the California Supreme Court held it was improper to award prejudgment interest for personal injuries and emotional distress sustained by reason of airport noise. (*Id.* at p. 102.) The court

---

[29] Section 3288 provides, "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." KMSL does not dispute the applicability of the provision to Altavion's misappropriation claim.

reasoned, "damages for the intangible, noneconomic aspects of mental and emotional injury are . . . inherently nonpecuniary, unliquidated and not readily subject to precise calculation. The amount of such damages is necessarily left to the subjective discretion of the trier of fact. Retroactive interest on such damages adds uncertain conjecture to speculation. Moreover where, as here, the injury was of a continuing nature, it is particularly difficult to determine when any particular increment of intangible loss arose." (*Id.* at p. 103.)

The trial court's award of prejudgment interest was not an abuse of discretion under *Greater Westchester*. Although, as the trial court acknowledged, it was difficult to measure Altavion's damages or KMSL's unjust enrichment, the trial court was able to determine a reasonable royalty for the misappropriated trade secrets. That royalty represented the " ' "hypothetically agreed value of what [KMSL] wrongfully obtained from" ' " Altavion, based on " ' "what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." ' " (*Ajaxo*, *supra*, 187 Cal.App.4th at p. 1308.) Thus, the damages are for a pecuniary injury, the amount of the royalty is based on an objective assessment of the evidence rather than a subjective assessment of harm, and the award of prejudgment interest compensates Altavion for loss of the use of the royalty funds it should have received at the time of misappropriation. (See *O2 Micro Intern. Ltd. v. Monolithic Power Systems* (N.D.Cal. 2006) 420 F.Supp.2d 1070, 1077 [awarding § 3288 prejudgment interest on reasonable royalty damages award]; see also *Canavin v. Pacific Southwest Airlines*, *supra*, 148 Cal.App.3d at p. 527 [in wrongful death case, awarding prejudgment interest on "damages attributable to an ascertainable economic value"]; *Harsany v. Cessna Aircraft Co.* (1983) 148 Cal.App.3d 1139, 1144 [proper to award interest where value of crashed plane was disputed, because "[t]his was a *property* loss, not the type of noneconomic loss for which prejudgment interest is denied"].) KMSL has not shown the trial court erred in identifying the date of loss, and, as noted in part V., *ante*, KMSL has not shown there is insufficient evidence to support

46

the trial court's determination of the amount of a reasonable royalty. KMSL has not demonstrated an abuse of discretion.**30**

VII. *Trial Court's Attorney Fees Award*

The trial court awarded Altavion attorney fees in the amount of $3,297,102.50 pursuant to section 3426.4. KMSL asserts several claims of error.

A. *Finding of Willful and Malicious Misappropriation**

A court may award reasonable attorney fees to the plaintiff in a trade secret case where "willful and malicious misappropriation exists." (§ 3426.4.) KMSL contends the trial court's finding KMSL willfully and maliciously misappropriated Altavion's trade secrets is not supported by substantial evidence. In making that finding, the court emphasized the evidence that KMSL secretly attempted to develop its own DST using Altavion's DST, and secretly filed for patents covering Altavion's DST.**31** KMSL asserts the FSOD contains "conclusions, not findings" on this issue, and that any findings are not supported by substantial evidence. To the contrary, the factual findings in the FSOD include a highly detailed description of the conduct by KMSL referred to by the trial

---

**30** KMSL cites *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 962, where prejudgment interest was denied under section 3287, subdivision (a) because damages were not "capable of being made certain" before trial. However, that section relates to interest on "liquidated" damages claims, while "section 3288 permits discretionary prejudgment interest for unliquidated tort claims." (*Greater Westchester*, *supra*, 26 Cal.3d at p. 102; see also *Newby v. Vroman* (1992) 11 Cal.App.4th 283, 286-287 [characterizing as "inapposite" cases decided under § 3287 "which hold that prejudgment interest is only appropriate if a plaintiff's damages are either known or knowable"]; *Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 572 [in contrast to § 3287, § 3288 "allows interest from date of monetary loss at the discretion of the trier of fact even if the damages are unliquidated"]; *In re Pago Pago Aircrash of January 30, 1974*, *supra*, 525 F.Supp. at p. 1015 [comparing §§ 3287 & 3288].)

* See footnote, *ante*, page 1.

**31** KMSL's February 2004 planning report outlined a "patent application plan" involving filing for a patent describing "an Altavion technology based method for creating self-authentic[ating] with embedded integrity data documents which can be authenticated from digital or print form." The record demonstrates that KMSL effectively proceeded with that plan, even after negotiations with Altavion fell through.

47

court in making its findings. For example, the trial court found that KMSL signed the August 2004 MOU with Altavion "to temporarily placate Moussa, without [KMSL] having any intention of performing on the MOU. Indeed, [*KMSL*] *entered into the MOU with* [*Altavion*] *at the same time that* [*KMSL was*] *filing patent applications on* [*DST*]." Because KMSL fails to provide any reasoned argument with citations to the record and supporting authority explaining why its conduct did not support a finding of willful and malicious misappropriation, its claim requires no further consideration. (*Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784-785.)**32**

B. *Apportionment**

KMSL next contends the amount of fees awarded by the trial court on the misappropriation claim was excessive, because the court awarded fees for time spent on the other causes of action in the Complaint (including conversion, breach of the NDA, unjust enrichment, unfair business practices, fraudulent misrepresentation, and fraudulent concealment). As explained in *Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133, "When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action. However, the joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when incurred for representation of an issue common to both a cause of action for which fees are permitted and one for which they are not. All expenses incurred on the common issues qualify for an award. [Citation.] When the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required." (Accord, *Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 577.)

---

**32** KMSL points out that the trial court's tentative statement of decision declined to find that KMSL's conduct was malicious. However, KMSL fails to present any argument why or authority that the absence of such a finding in the tentative decision affects our analysis regarding the sufficiency of the evidence to support the findings in the FSOD.

\* See footnote, *ante*, page 1.

48

Altavion asked for fees for more than 6,100 hours of attorney time and more than 500 hours of paralegal time, from which the trial court deducted only 80.4 hours. The trial court explained its award and decision not to enhance Altavion's fees award with a multiplier as follows: "This lawsuit was brought by [Altavion] alleging seven causes of action and suing six defendants. It is not subject to reasonable dispute that this was a complex case involving intellectual property claims. [Altavion] only prevailed on one cause of action (for misappropriation) against one defendant. On the other hand, most of the claims were inextricably intertwined, or the facts and evidence were interlinked. All of the named defendants were interrelated. The time records for the attorneys are not easily segregated by claim or by specific defendant. Only a fraction of the amount of compensatory damages sought were ultimately awarded. Inefficiencies existed in the prosecution of the case, as identified in the opposition, and otherwise. The skill and experience of [Altavion's] attorneys is already recognized by the hourly rates utilized by the [c]ourt in calculating the lodestar. On balance, the Court exercises its discretion and DENIES [Altavion's] request for a multiplier/enhancement of the lodestar amount."

KMSL asserts, "[t]he trial court's suggestion that apportionment was inappropriate because most of Altavion's claims 'were inextricably intertwined' . . . is belied by its finding that apportionment wasn't practical because the 'time records for the attorneys are not easily segregated by claim or specific defendant.' " However, those are distinct findings. The trial court found *both* that the claims, facts, and evidence were intertwined and interrelated *and* that the time records were not easily segregated. Regardless of whether the nature of Altavion's attorneys' time records was an appropriate basis to limit apportionment, the intertwined nature of the claims and evidence *was* a proper basis to do so. (*Akins v. Enterprise Rent-A-Car Co.*, *supra*, 79 Cal.App.4th at p. 1133; *Yield Dynamics*, *supra*, 154 Cal.App.4th at p. 577.) KMSL cites no authority to the contrary, and KMSL fails to analyze Altavion's claims and evidence to demonstrate the trial court erred in concluding the awarded hours represented work on the common issues in the case. KMSL has not shown the court abused its discretion in declining to further apportion the hours. (*Yield Dynamics*, at p. 577.)

49

C. *Hourly Rates*

The trial court used $600 per hour as "the reasonable hourly rate prevailing in the community for similar work for" attorneys Glenn Peterson and John Costello, and $350 per hour for attorney Pamela Bertani's work. KMSL contends the court erred because those attorneys charge lower hourly rates in Sacramento, where they are based. KMSL argues it was error to base the attorney fees award on the higher attorney hourly rates in San Mateo County.

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' [Citation.]" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 (*PLCM Group*).)

At bottom, KMSL argues the trial court was precluded as a matter of law from awarding fees based on local rates rather than Altavion's counsel's normal Sacramento rates. However, the hourly rate adopted by the court was consistent with the general rule: "The reasonable hourly rate is that prevailing in the community for similar work." (*PLCM Group*, *supra*, 22 Cal.4th at p. 1095.) The relevant "community" is that where the court is located. (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1242-1243; see also *Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267, 1286; *MBNA America Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 13 ["determination of market rate is generally based on the rates prevalent in the community where the services are rendered, i.e., where the court is located"]; *Camacho v. Bridgeport Financial, Inc.* (9th Cir. 2008) 523 F.3d 973, 979 ["[g]enerally, when determining a reasonable hourly rate, the relevant community is the

50

forum in which the district court sits"]; 2 Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed. 2014) Determining Lodestar, § 9.114, p. 9-98) ["determination of 'market rate' is generally based on the rates prevalent in the community where the court is located"].)**33**

KMSL points to authority that attorneys practicing in other localities may be able to obtain an award based on their higher home hourly rates in some circumstances; KMSL argues there is an absence of authority supporting the specific result in this case— a fee award based on *higher local rates*. For example, the court in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, concluded the trial court had discretion to base its fee award on the plaintiff attorney's higher home hourly rate in the "unusual circumstance" that local counsel was unavailable. (*Id.* at p. 399; cf. *Nichols v. City of Taft*, *supra*, 155 Cal.App.4th at p. 1242 [trial court "erred when it used a multiplier enhancement to compensate for out-of-town counsel's higher fee rate, because no threshold showing was made that it was impracticable for plaintiff to hire local counsel"].) Although *Horsford* demonstrates there are circumstances where it is appropriate to base a fee award on nonlocal hourly rates, the case also supports the proposition that an award based on local rates is the *default* rule, from which the trial court may deviate in its discretion, where justified by the circumstances.

KMSL points to no such circumstances in the present case, beyond the bare fact that Altavion's counsel's home rates in Sacramento are lower. But that circumstance is insufficient in itself, because the rule that fee awards generally should be based on reasonable local hourly rates presupposes that an attorney's *actual* rates may be different

---

**33** In *PLCM Group*, the California Supreme Court affirmed an award based on the "prevailing market rate for comparable legal services in San Francisco, where counsel is located." (*PLCM Group*, *supra*, 22 Cal.4th at p. 1096.) Although the opinion does not state so directly, the history of the case shows it was litigated in Los Angeles. (See 2 Pearl, Cal. Attorney Fee Awards, *supra*, § 9.114, pp. 9-98 to 9-99.) The issue in *PLCM Group* was whether the trial court was required to "determine reasonable attorney fees based on actual costs and overhead" (*PLCM Group*, at p. 1098); the court did not address whether the relevant community for determining reasonable hourly rates is generally that where the court is located or where counsel's office is located. The decision is not authority for an issue it did not consider. (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348.)

51

for any number of reasons—because, for example, the attorney normally charges higher or lower rates, works on a contingency basis, or is in-house counsel. As explained in *Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1260, " 'The reasonable market value of the attorney's services is the measure of a reasonable hourly rate. [Citations.] This standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel.' "

KMSL has not demonstrated the trial court abused its discretion in basing its fee award on local hourly rates; neither has KMSL shown the hourly rates employed by the trial court were unreasonable in light of the types of factors referenced in *PLCM Group*, *supra*, 22 Cal.4th at page 1096.**34**

D. *Altavion's Time Records*\*

Finally, KMSL contends the trial court's attorney fees award must be reversed because "[t]he time records submitted by Altavion for its attorneys' work were incomplete and unreliable, and they certainly cannot support the award made here." KMSL references several "irregularities" in the time records, but it makes no showing the referenced circumstances involved a significant number of hours. In denying Altavion enhancement of the lodestar fees award, the trial court took into account the lack of detail in Altavion's time records and the "[i]nefficiencies [that] existed in the prosecution of the case." KMSL has not shown that any of the referenced problems with Altavion's time records require this court to conclude the overall fees award is unreasonable. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 ["The ' "experienced trial judge is the best judge of the value of professional services rendered in [his/her] court, and while [his/her] judgment is of course subject to review, it will not be disturbed unless the

---

**34** We do not consider whether or what circumstances could support a trial court's decision to base a fee award on an attorney's lower home hourly rates. Because a trial court generally should base its fee award on reasonable local hourly rates, no special circumstances were required in the present case to support the trial court's decision to do so.

\* See footnote, *ante*, page 1.

appellate court is convinced that it is clearly wrong." ' "]; *PLCM Group*, *supra*, 22 Cal.4th at p. 1095 ["trial court has broad authority to determine the amount of a reasonable fee"].)

## DISPOSITION

The trial court's judgment is affirmed.  Costs on appeal are awarded to Altavion.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
NEEDHAM, J.

Superior Court of San Mateo County, No. CIV467662, Marie S. Weiner, Judge.

Morrison & Foerster, Miriam A. Vogel, Bryan J. Wilson, Roman A. Swoopes and Daniel Wan for Defendant and Appellant.

Millstone Peterson & Watts, Glenn W. Peterson; Costello Law Corporation and John P. Costello for Plaintiff and Respondent.