Filed 8/28/25  Viqual Medical Technology v. Kaiser Foundation Health Plan CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| VIQUAL MEDICAL TECHNOLOGY, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., <br><br> Defendant and Respondent. | A170337 <br><br> (Alameda County <br> Super. Ct. No. RG18926484) |

Plaintiff Viqual Medical Technology, LLC (Viqual) appeals from the trial court's order granting defendant Kaiser Foundation Health Plan, Inc.'s (Kaiser) motion for summary judgment.  On appeal, Viqual asserts the trial court erroneously focused on encryption rather than its entire trade secret in rejecting its trade secret misappropriation claim.  Viqual further contends its trade secret was disclosed to and improperly used by Kaiser, Kaiser's retention of Viqual's prior counsel demonstrates improper disclosure of confidential information, and the trial court's "busy schedule" rendered it unable to "appreciate the complex nature" of Viqual's trade secret.  We affirm the judgment.[1]

_____

[1] On May 19 and 23, 2025, Frederick Goodwill and Robert Eisenman, respectively, submitted applications for permission to file an amicus brief in

Viqual, a company founded by George McKinney and Keith Mathis, devised a technology for a wireless wearable device in the form of a badge designed for patients suffering from diabetes, heart conditions, and other medical conditions which require monitoring. In developing its technology, Viqual hired Mukund Halthore as a consultant and obtained a badge from Sharp Mesa Vista Hospital as a starting point for Viqual's badge development. Halthore incorporated into the badge "SafeKey" and "SafeKard" technologies he had previously created with Robert Eisenman in 2001. That badge had the ability to receive and transmit data, including from a diagnostic wristband; could identify the use and the user's location, enable the user's communication, and allow access to a secure location; and could be programmed. Neither the pre-existing badge nor the SafeKey and SafeKard technologies were, or have ever been, owned by Viqual. Rather, they are owned by Eisenman, and he holds the patent to that technology. Halthore and his colleague, Rajan Mistry, then developed a platform for Viqual that "would allow the safe flow of human vitality information from patient to physician anytime and anywhere in a HIPAA[2] compliant manner."

In late 2011, McKinney met with Edward Littlejohn, Kaiser's Southern California regional chief operating officer, to discuss Viqual's technology. In early 2012, a second meeting occurred, this time between Viqual and Bernard

---

support of Viqual. On May 30, 2025, this court denied both requests. On May 30, 2025, this court received a second application by Eisenman for leave to file an amicus brief in support of Viqual. This court now denies that request for the same reasons set forth in its May 30, 2025 order.

[2] The Health Insurance Portability and Accountability Act of 1996 (Pub.L. No. 104-191 (Aug. 21, 1996) 110 Stat. 1936; HIPAA).

Tyson, Kaiser's president and chief operating officer. A third meeting then occurred later in 2012 between Jed Weissberg, Kaiser's senior vice president of quality care and delivery, and several Viqual representatives. Viqual prepared a PowerPoint presentation which offered "a 30,000-foot overview of [Viqual's] invention." Kaiser decided not to pursue Viqual's technology.

*Viqual's Lawsuit Against Kaiser*

Viqual filed a second amended complaint against Kaiser, alleging breach of contract, misappropriation of trade secrets, misappropriation of ideas, breach of implied-in-fact contract, misrepresentation, unjust enrichment, and unlawful and unfair business practices.[3] The complaint alleged Viqual created a remote patient monitoring system to allow patients and doctors to communicate and monitor medical conditions, Viqual shared its trade secrets with Kaiser pursuant to a nondisclosure agreement, and Kaiser misappropriated Viqual's technology by attempting to use and/or share the information with Viqual's competitors.

Kaiser filed a demand for identification of trade secrets. Following multiple unsuccessful responses, Viqual filed its third amended response to Kaiser's demand for identification of trade secrets. In that response, Viqual identified two trade secrets. First, it identified the "[c]oncept and [m]ethod" of a secure, real-time health monitoring system. The response explained Viqual's idea was unique from other health monitoring systems on the market because (1) it contained an encryption solution that met HIPAA standards, (2) it was self-charging, (3) it transmitted GPS information from patient to healthcare provider, and (4) it allowed direct interaction and

---

[3] Viqual also alleged unlawful discrimination in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.; UCRA). The court sustained Kaiser's demurrer to that cause of action without leave to amend.

communication between healthcare provider and patient via two-way cellular technology. The second trade secret identified by Viqual was its methodology of incorporating HIPAA-compliant encryption technology. Viqual identified an eight-step process in which (1) the device establishes IP connectivity with the server, (2) the device sends an encrypted key to the server, (3) the server decrypts the key and requests a unique identifier from the device, (4) the device sends the unique identifier to the server, (5) the device can then send data to the server, (6) the healthcare provider inputs their username and password into their badge, (7) the server sends a key to the healthcare provider, and (8) the healthcare provider inputs the key into the badge and receives an encrypted link from the server to access the requested data.

The court rejected Kaiser's objections to the third amended trade secret disclosure, noting in relevant part it "more specifically identifies the steps involved in [Viqual's] methodology for secure, compliant transmission."

*Summary Judgment*

Following discovery, Kaiser moved for summary judgment. In connection with Viqual's trade secret misappropriation claim, Kaiser first argued Viqual could not prove it developed the alleged trade secret. Kaiser noted both trade secrets listed in Viqual's third amended trade secret identification included use of a proprietary method of encryption, and it claimed such encryption was the only increment Viqual added to a third party's—Eisenman's—existing invention. While Viqual alleged that employee Rajan Mistry developed its encryption software, Kaiser noted that Mistry denied working on any encryption technology or HIPAA-related methodologies and merely enabled existing encryption involving third party software built into third party devices.

4

Second, Kaiser argued Viqual could not prove it shared the alleged trade secret with Kaiser. Because the alleged trade secrets were "the combination of elements" rather than the individual elements, Viqual had to demonstrate it shared all the elements of the trade secret; but, Kaiser asserted, seven of the eight elements of encryption were never shared with Kaiser. Kaiser argued the record unambiguously demonstrated Viqual never discussed any specific details of its encryption/transmittal process.

Third, Kaiser asserted Viqual could not prove Kaiser used or disclosed the alleged trade secret. Kaiser noted that its employees involved in remote patient monitoring testified they were unaware of Viqual and had never been asked by Tyson or Weissberg to develop a remote patient monitoring program. Kaiser also argued the similarities identified by Viqual between its alleged trade secret and various Kaiser systems did not demonstrate disclosure or use because Viqual could not demonstrate that Kaiser's systems were "substantially derived" from Viqual's trade secret. Rather, Kaiser asserted, the alleged similarities related to generally known features not derived from Viqual's specific proprietary method of encryption or a self-charging wearable device.

Kaiser also moved for judgment on the non-trade secret claims, asserting those claims were either preempted or failed on the merits.

Viqual opposed the motion. In its opposition, Viqual stated that its "trade secret was a tune-able and adjustable encryption which 1) was delivered in the form of a wearable badge, 2) transmitted patient information in compliance with [HIPAA] protections, 3) could be tailored to communicate with numerous amounts of programming, and 4) was designed to be applicable to other forms of applications, in addition to the badge." Viqual argued its use of a SafeKey and SafeKard system developed by Eisenman and

Halthore did not render its trade secret unprotectable because its trade secret was a combination of elements, and Halthore improved on Eisenman's software through the addition of encryption.

Viqual also asserted the evidence demonstrated it shared its trade secrets with Kaiser, and Kaiser misappropriated those trade secrets. While Viqual acknowledged that the presentations it provided to Kaiser lacked detail, it emphasized that McKinney discussed specific details of the trade secret with Kaiser. Viqual further argued that three Kaiser programs were substantially similar to its trade secret.

Finally, Viqual disputed that its non-trade secret claims were subject to preemption and argued such claims were supported by substantial evidence.

Viqual submitted declarations from McKinney and Eisenman in support of its opposition. McKinney's declaration asserted he created technology that would "collect and transmit encrypted diagnostic information from a patient to the patient's treating physician," and this technology "included a badge that would evolve with the encryption system." McKinney also stated he recalled having specific discussions of the "proprietary encryption techniques" with Kaiser.

Eisenman's declaration stated he developed "the SafeKey and SafeKard security badges" in approximately 2001. He stated his badge "is a personal wearable safety device that is location enabled," "contains 2-way instant communication technology . . . to send and or receive personal and other pertinent data and information to another location," "has the capability to receive and transmit data," "can be used . . . with a diagnostic medical wristband," is "capable of identifying distinct users," "is location and communication enabled," "allows access to a secure location," and "is programmable."

6

In reply, Kaiser noted Viqual failed to dispute its material facts, which established Viqual did not develop its alleged trade secrets, and Kaiser never used or disclosed the alleged trade secrets. Kaiser further asserted McKinney's declaration in support of Viqual's opposition regarding disclosure of the trade secrets contradicted his sworn deposition testimony.

The court granted Kaiser's motion for summary judgment based on three different and independent grounds. First, the court noted Viqual failed to "clearly" state what features of the alleged trade secret were unknown. It explained Viqual's opposition "most clearly describes its trade secret with reference only to the encryption component," and the opposition did not assert "that any specific non-encryption elements or combinations were a trade secret." The court further stated, "[Viqual] does not have an expert opinion as to what about [Viqual's] alleged trade secret or confidential information, aside from the encryption, was not known before 2011." Accordingly, the court concluded "there is no evidentiary support that [Viqual's] trade secret could have been anything other than the encryption method."

Next, the court found no admissible evidence that Viqual disclosed any alleged trade secrets to Kaiser. The court explained that Viqual only shared two documents with Kaiser—the "Project Hawk Summary" and the "Kaiser Presentation"—and neither identified any of the eight proprietary steps that constituted Viqual's encryption trade secret. The record also reflected that encryption was only discussed at the June 2012 meeting by McKinney, but McKinney testified he was only given "some talking points" and not "given a detailed explanation of how it worked or how it interacted with hardware." The court noted McKinney testified he did not recall what, if any, encryption steps were explained to Kaiser. The court disregarded McKinney's

7

declaration in opposition to summary judgment to the extent it contradicted this prior deposition testimony.

The trial court also concluded that, even assuming Viqual discussed its specific encryption methodology with Kaiser, Viqual presented no evidence that Kaiser used any information "about encryption or any other unique aspect that [Viqual] disclosed." The court explained Viqual's "substantial similarity" argument required it to show characteristics that "can be reasonably said to be derived from [Viqual's] information, not generic components that are common to enterprises in the field." However, the court concluded Viqual failed to show similarities other than generic components in the three programs at issue: (1) In Kaiser's partnership with Cognizant,[4] Viqual did not identify any unique elements or opine that any information was derived from confidential Viqual information, and it instead generically referenced securely sent information; (2) Kaiser's interaction with Validic[5] did not appear to involve development of any particular system, the only relevant document was " 'very high-level,' " and that document did not refer to any conceptual features, such as a self-charging or smart badge, that indicated it could be derived from Viqual's trade secrets; and (3) Kaiser's 2018 program did not detail any method of encryption or refer to a self-charging or smart badge, and Viqual failed to identify what part of that

---

[4] Cognizant Technology Solutions U.S. Corp. (Cognizant) is a "leading provider of IT solutions."

[5] Motivation Science, Inc., doing business as Validic, is a startup whose business is focused on corporate health and wellness. Viqual considers Validic to be a competitor.

8

program was derived from its trade secrets or was not generally known at that time.[6]

The court concluded there was no evidence Kaiser breached the nondisclosure agreement or misappropriated Viqual's trade secrets. It thus granted summary adjudication as to the first, second, and fourth causes of action. The court also found the remaining causes of action for misrepresentation of ideas, breach of confidential relationship, misrepresentation, unjust enrichment, and unlawful and unfair business practices (non-UCRA) were preempted by the California Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.; CUTSA)[7] "because they are based entirely on the same factual allegations that form the basis of the trade secrets claim."

Viqual timely appealed from the judgment.

DISCUSSION

## I. Standard of Review

The standard of review for summary judgment motions is well established. " 'Summary judgment is appropriate when there are no triable issues of material fact such that the moving party is entitled to judgment as a matter of law on all causes of action.' " (*Berlanga v. University of San Francisco* (2024) 100 Cal.App.5th 75, 81 (*Berlanga*).)

" 'We review an order granting summary judgment de novo, applying the same three-step analysis as the trial court. [Citations.] First, we identify the causes of action framed by the pleadings. Second, we determine whether the moving party has satisfied its burden of showing the causes of action

---

[6] The court also found that Viqual did not offer evidence of direct misappropriation. Viqual does not contest this on appeal.

[7] All undesignated statutory references are to the Civil Code.

have no merit because one or more elements cannot be established, or that there is a complete defense to that cause of action.  Third, if the moving party has made a prima facie showing that it is entitled to judgment as a matter of law, the burden of production shifts and we review whether the party opposing summary judgment has provided evidence of a triable issue of material fact as to the cause of action or a defense.  [Citations.]  A party opposing summary judgment may not "rely upon the allegations or denials of its pleadings" but must set forth "specific facts" beyond the pleadings to show the existence of a triable issue of material fact.' " (*Berlanga*, *supra*, 100 Cal.App.5th at pp. 81–82.)

We independently determine whether the record supports the trial court's conclusions that the asserted claims fail as a matter of law. (*Berlanga*, *supra*, 100 Cal.App.5th at p. 82.)  In so doing, we view the evidence in a light favorable to the losing party and resolve any evidentiary doubts or ambiguities in the losing party's favor. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859.)

## II.  Summary Judgment Ruling

### A.  Trade Secret Misappropriation

The California Legislature " 'adopted without significant change' " the Uniform Trade Secrets Act.  (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 41 (*Altavion*); 14 West's U. Laws Ann. (2021) U. Trade Secrets Act, p. 628.)  The CUTSA created a statutory cause of action for misappropriation of a trade secret, which protected the trade secret owner "against the appropriation of the secret by improper means and the subsequent use or disclosure of the improperly acquired secret." (*Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 222.)

10

The CUTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).) As relevant here, trade secret misappropriation occurs when a person discloses or uses, without consent, another's trade secret that the person, "[a]t the time of disclosure or use, knew or had reason to know that [their] knowledge of the trade secret was" "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." (*Id.* subd. (b)(2)(B)(ii), (iii).)

## 1. Scope of Viqual's Trade Secret

Viqual argues the trial court "used the wrong standard" by finding no evidence of a trade secret apart from the encryption method and "requiring a secret unbeknownst to the world." Viqual asserts its trade secret was a combination of elements, in which HIPAA-compliant encryption was one element.

Undoubtedly, a trade secret can include a system where public domain elements have been effectively and valuably integrated with the trade secret, which provides " 'a competitive advantage [that] is protected from misappropriation.' " (*Altavion, supra*, 226 Cal.App.4th at p. 48.) But the trial court did not conclude—as Viqual asserts—that its combination was not a trade secret. Rather, the court concluded encryption was a necessary feature of Viqual's trade secrets because Viqual did not identify any non-encryption elements or combinations that constituted a trade secret—i.e., without the

11

encryption methodology, there was no trade secret. In support of its conclusion, the court cited Viqual's own description of its trade secret in its opposition to Kaiser's summary judgment motion: Viqual's trade secret is "a tune-able and adjustable encryption which 1) was delivered in the form of a wearable badge, 2) transmitted patient information in compliance with [HIPAA] protections, 3) could be tailored to communicate with numerous amounts of programming, and 4) was designed to be applicable to other forms of applications, in addition to the badge."

The court's focus on encryption is supported by Viqual's responses to Kaiser's separate statement of undisputed material facts (SSUMF). For example, in response to Kaiser's SSUMF No. 15, which states the encryption referenced in the first trade secret is the same method of encryption claimed as the second trade secret, Viqual responded: "Undisputed, but the encryption applies to both trade secrets (which are really one trade secret given that it is an integrated whole)." Nor has Viqual identified any other elements of its trade secret—apart from the encryption methodology—that distinguish it from Eisenman and Halthore's pre-existing SafeKey and SafeKard technology. Viqual thus acknowledged that its trade secret necessarily includes its method of encryption, and Viqual has not argued any trade secret would exist without its encryption methodology. As such, it was appropriate for the trial court to focus on the encryption method in assessing whether Kaiser made a prima facie showing that Viqual cannot establish one or more elements of its claim for trade secret misappropriation.

In so holding, we acknowledge that a plaintiff need not provide evidence that a defendant used each and every element of an alleged trade secret to prove trade secret misappropriation. (*Zunum Aero, Inc. v. Boeing Company* (W.D. Wash., Apr. 22, 2024, No. C21-0896JLR) 2024 WL 1803118

12

at p. *6.)  Here, however, Viqual built its trade secret based on pre-existing badge technology that it did not—and does not—own.  Accordingly, in this context it was appropriate for the court to focus on the developments Viqual added to that pre-existing technology.

## 2.  Disclosure of the Trade Secret

As discussed above, a trade secret misappropriation claim requires Viqual to prove that (1) Kaiser acquired knowledge of the trade secret under circumstances that would require Kaiser to maintain its secrecy or limit its use, and (2) Kaiser failed to do so.  (§ 3426.1, subd. (b)(2)(B).)  Here, the trial court found Viqual did not share any trade secret with Kaiser because no details of the encryption method were provided.  The court further found Kaiser did not use or disclose any of Viqual's disclosures—even assuming such information constituted trade secrets.  Viqual fails to identify any triable issues of material fact regarding these issues.

### a.  Forfeiture

Kaiser contends Viqual forfeited its challenge to the trial court's finding that Viqual failed to present any "evidence that Kaiser used any information about encryption or any other unique aspect that [Viqual] disclosed."  Kaiser notes Viqual did not challenge that finding in its opening brief, and the finding is dispositive as to Viqual's misappropriation claim.  Viqual does not respond to Kaiser's forfeiture argument.

"As with any civil appeal, we must presume the judgment is correct, indulge every intendment and presumption in favor of its correctness, and start with the presumption that the record contains evidence sufficient to support the judgment."  (*Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1251.)  "[A]ppellants forfeit or abandon contentions of error regarding the dismissal of a cause of action by failing to raise or address the

13

contentions in their briefs on appeal." (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177.)

This same burden applies even to appellate claims that are subject to the de novo standard of review, such as an order granting summary judgment. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.) Appellants are required to point out triable issues with citations to the record and supporting authority, and our review is limited to issues that are adequately raised and briefed. (*Id.* at p. 126; *Bains v. Moores* (2009) 172 Cal.App.4th 445, 455 [" 'On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court.' "].)

Viqual's opening brief contains a section entitled, "There is sufficient evidence that a jury could find a trade secret was disclosed and used innapropriately [*sic*] to the detriment of appellant." (Block capitalization omitted.) The first paragraph of that section summarily states that its expert "identifie[d] substantial similarities between [Viqual's] trade secret" and (1) Kaiser's "remote patient monitoring solution described in Kaiser's Tele-Monitoring Strategy via Mobile-Attached Biomedical Devices and Mobile Attached Medical Devices"; (2) Kaiser and Validic's "remote patient care solution as described in Kaiser's Wearables Strategy"; and (3) Kaiser and Samsung's "Cardiac Rehabilitation Program." The remainder of the section, however, discusses (1) the trial court's rejection of McKinney's declaration as a sham declaration, and (2) the meetings between Viqual and Kaiser. No section of Viqual's opening brief discusses Kaiser's alleged use and/or disclosure of the trade secrets.

This one paragraph, which summarily claims Kaiser utilized Viqual's trade secret in three different contexts, is insufficient to preserve its

14

contention of error as to the element of use/disclosure. Viqual makes no effort to explain how the three alleged Kaiser uses were substantially similar to Viqual's trade secrets. Viqual also does not cite any authority suggesting the degree of similarity between its trade secrets and Kaiser's uses rises to a level evidencing misappropriation. Nor does Viqual undertake any effort to identify error in the trial court's reasoning or demonstrate that a triable issue of material fact exists regarding Kaiser's use and/or disclosure of its trade secrets.

To the contrary, Viqual did not contest *any* facts set forth in Kaiser's SSUMF regarding alleged use/disclosure, including that: (1) the Cognizant system documents did not have any specific reference to encryption; (2) the Cognizant system documents did not refer to use of a self-charging, wearable, vitality-monitoring device or smart badge; (3) the "Cognizant Solution Sheet" was a " 'one-off proof of concept document' " that Kaiser never implemented or otherwise utilized; (4) Kaiser did not actually develop a system with Validic; (5) the " 'high-level' " Validic memorandum did not identify any particular method of encryption but " 'generally refers to communication protocols' "; (6) the " 'high-level' " Validic memorandum did not refer to use of a self-charging, wearable, vitality-monitoring device or smart badge; (7) there was no evidence Kaiser implemented the Validic memorandum; (8) the article about Kaiser's use of smartwatches with cardiac rehabilitation patients did not detail any method of encryption or refer to use of a self-charging, wearable, vitality-monitoring device or smart badge; (9) no internal Kaiser presentations on collecting patient data referred to any specific method of encryption or use of a self-charging, wearable, vitality-monitoring device or smart badge; and (10) there was no evidence the concepts in these internal Kaiser presentations were implemented.

15

Accordingly, the trial court's finding that Kaiser did not use or disclose Viqual's trade secret is dispositive and supports affirming summary judgment in favor of Kaiser. However, even if the argument had not been forfeited, additional grounds support affirmance of the judgment.

### b. Communication of the Trade Secret

Viqual asserts the trial court erred in finding that there was no triable issue of material fact regarding whether the encryption method was communicated to Kaiser. Viqual contends "[t]here was definitely extensive discussion about the way the badge would work and the coalescing of various technologies to bring a completed usable and valuable patient monitoring device in the form of a badge to the market."

### i. Relevant Background

Kaiser submitted the following facts in its SSUMF in support of its motion for summary judgment, none of which were disputed by Viqual in its opposition:

(1) McKinney, Mathis, and Littlejohn met in November 2011. Viqual did not discuss encryption at this meeting.

(2) McKinney, his brother, his father, Mathis, and Tyson met in February 2012. Viqual did not discuss " 'particulars about any trade secret' " but " 'just took a very high-level view.' "

(3) McKinney, his brother, his father, consultant Robert Walker, Weissberg, and Tyson met in June 2012.

(4) At the June 2012 meeting, Viqual only provided Kaiser with two documents: the "Project Hawk Summary" and the "Kaiser Presentation."

16

(5) The Project Hawk Summary did not provide any information about encryption, and did not provide an encryption algorithm for the purpose of the use of a wearable device.

(6) The Kaiser Presentation only contained the following references to encryption: (i) under the heading " '4 Major Strengths of our Wireless Wrist Band': 'Highest Commercial Encryption Technology that prevents hackers' " (underscoring omitted); (ii) under the heading " 'How it works ?': 'Our encryption process has the ability to prevent hacking of information' "; and (iii) a slide titled " 'Encryption Technology' " stating: " 'We deliver Advanced Encryption to assure patient records [*sic*] confidentiality and integrity'; 'We also incorporate cutting edge linear encryption technology' "; and " 'Our system of encryption utilizes the highest level of hacker-proofing available.' "

(7) Neither the Project Hawk Summary nor the Kaiser Presentation contained reference to steps 2 through 8 of the encryption method set forth in Viqual's trade secret identification.

(8) McKinney did not recall explaining any particular step of a method of encryption to Kaiser at the June 2012 meeting.

(9) McKinney only recalled stating the method of encryption was " 'a method of coding where you would . . . capture vitality information. First, to log in, you would have to have some type of log-in process where you would -- it would identify you as the person that is receiving or transmitting information. So when you transmit information, that information would go through some type of . . . a system, checks and balances system, so that the identification of the person, and not only that, but the identification of the receiver,

would be . . . kept intact, which would guard from third parties being involved.' "

(10) No other participant who testified during the litigation recalled any discussion of encryption at the June 2012 meeting.

Kaiser also submitted excerpts of McKinney's deposition testimony, in which he stated he was "given certain talking points" regarding encryption but "wasn't given a detailed explanation of how it worked or how it interacted with hardware. . . . [¶] . . . We said if there were any questions about any part of our presentation that . . . our engineers would be available to discuss the specifics."

In connection with its opposition, Viqual submitted a declaration from McKinney. McKinney acknowledged the documents provided to Kaiser did not include details of Viqual's invention, but stated Kaiser's representative "used the hour to discuss specific elements of the invention." Specifically, McKinney declared: "I recall that there was discussion of proprietary encryption techniques, a push-pull system human diagnostic triangulation system that included a proprietary display, a badge, and a wristband. I also recall mentions or discussion of (i) sending an Advanced Encryption Standard ('AES') encrypted key to the server from each device, which would have a Unique Identifier ('UUID'); (ii) a server decrypting the device key and sending acknowledgment to the device, requesting the device's UUID; (iii) having the device send the UUID to the server which, upon receipt and verification, would send an acknowledgement to the device; (iv) upon completion of the device authentication, the device would send actual data to the server; (v) third parties, such as physicians or other caregivers, could then download a patient's data from the server after inputting their username and password into a badge; (vi) a redundant, time sensitive key

18

would be sent to their smartphone, pager, or e-mail address; and (vii) the third party could then enter the key into the badge to access the system, at which point the server would send the badge a [Data] Encryption Standard ('DES') encrypted link to access and download the requested data."

The trial court disregarded McKinney's declaration, noting Viqual "offers no explanation . . . for why McKinney's deposition testimony directly contradicts the substance of his declaration offered here." The court noted McKinney's declaration identified "seven specific steps of considerable technical complexity," which "is clearly different from his deposition testimony." The court noted the only explanation Viqual provided for the discrepancy was "an unsworn narrative" in which McKinney claimed he was not adequately prepared for his deposition. Because of the "significant[ ] differen[ce]" between McKinney's deposition testimony and declaration, coupled with the lack of any "real explanation," the court found the sham declaration doctrine applied and McKinney's declaration "must be disregarded."

The trial court thus concluded the undisputed material facts demonstrated Viqual's alleged trade secrets were never conveyed to Kaiser. The court noted neither the documents provided to Kaiser nor the testimony of participants in the meetings between the companies indicate any discussion of the eight-step encryption methodology that is a necessary component of Viqual's trade secrets.

## ii. Analysis

Viqual argues McKinney's declaration created a triable issue of fact, but the trial court improperly disregarded the declaration as a sham declaration. Viqual again returns to its argument that the trial court improperly focused on encryption in applying the sham declaration doctrine.

19

Under the "sham declaration doctrine," a party cannot create a triable issue of fact simply by submitting a declaration that contradicts "a clear and unequivocal admission" in a prior deposition. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21; *Tiffany Builders, LLC v. Delrahim* (2023) 97 Cal.App.5th 536, 547.) This doctrine, however, only applies "if there is no credible explanation for the supposed inconsistency," and courts are to consider the entire record in deciding whether to disregard contradictory testimony. (*Tiffany Builders, LLC*, at p. 547.)

Here, Viqual does not provide any meaningful analysis for why the sham declaration doctrine should not apply. Viqual does not argue McKinney's declaration and deposition testimony are not contradictory. Nor does Viqual argue that McKinney adequately explained any discrepancy in his testimony. And Viqual does not cite any authority suggesting the sham declaration doctrine should not apply in this context. Instead, Viqual returns to its claim that the trial court improperly focused on encryption as its sole trade secret. Not only do we find Viqual's argument meritless, as explained *ante* in part II.A.1., but the argument is irrelevant to the question of whether the trial court erred in applying the sham declaration doctrine.

We agree with the trial court that paragraph 19 of McKinney's declaration—which asserts that, at the June 2012 meeting, McKinney communicated to Kaiser seven highly technical steps related to the encryption method—directly conflicts with McKinney's prior deposition testimony. In evaluating the entire record, none of the participants in the meeting (who provided testimony) indicated the parties had any detailed discussion regarding encryption methods. McKinney's brother had no recollection of the meeting; Weissberg did not recall any discussion of encryption; and McKinney stated he was only provided with "talking points"

20

for the meeting and "wasn't given a detailed explanation of how [encryption] worked." McKinney further stated he did not remember what encryption steps he explained to Kaiser.

The only explanation in the record for this inconsistency, as noted by the trial court, is a statement McKinney attaches as an exhibit to his declaration. That statement claimed McKinney was "not adequately prepped by [Viqual's] then counsel . . . for [Viqual's] depositions. If [McKinney] had been adequately prepped on particular questions [he] would have been prepared to answer with confidence and specificity, which is hard to do when [Viqual's representatives] weren't prepared for the questions[,] especially when questions are intentionally confusing with the intent to mislead." But this statement does not provide the "credible explanation" required to avoid the sham declaration doctrine. First, the statement is ambiguous as to what questions it is referencing—i.e., is McKinney referencing the encryption questions or some other subset of the numerous questions asked during his deposition. Second, Viqual does not explain how the lack of deposition preparation resulted in his contradictory substantive responses. In sum, Viqual offers no credible explanation for harmonizing his deposition response (I "wasn't given a detailed explanation of how [encryption] worked") with his declaration (I discussed with Kaiser seven highly technical encryption steps).

Because the trial court did not err in disregarding McKinney's declaration, Viqual failed to demonstrate a triable issue of material fact as to what information Viqual communicated to Kaiser. And the undisputed evidence demonstrates those meetings did not include a detailed discussion of the encryption method that is an integral component of Viqual's claimed trade secrets. Accordingly, Viqual failed to demonstrate Kaiser acquired

21

knowledge of the trade secret, which defeats Viqual's trade secret misappropriation claim.

### B. *Breach of Contract and Breach of Implied-in-fact Contract Claims*

Viqual devotes its opening brief to contesting the trial court's ruling on its trade secret misappropriation claim. Viqual then argues, for the first time in its reply brief, that its breach of contract and breach of implied-in-fact contract claims are not subject to preemption and are supported by substantial evidence.

Appellate courts generally will not consider issues raised for the first time in a reply brief. " 'Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158.) For this reason, we decline to address these issues and find them waived.

### III. Viqual's Remaining Arguments

Viqual raises two additional arguments on appeal. First, it contends Kaiser's retention of Viqual's prior counsel "is circumstantial evidence of improper disclosure of confidential information." (Capitalization omitted.) Second, it contends the trial court was too busy to "appreciate the complex nature of [Viqual's] trade secret." (Capitalization omitted.) Both arguments fail.

Viqual offers no evidence of any impropriety regarding Kaiser's alleged retention of Viqual's former counsel. For example, Viqual does not identify which law firm it claims Kaiser retained, which attorneys within that firm represented Viqual, which attorneys within that firm were hired by Kaiser,

when Kaiser hired the firm, or what work that firm is or was performing for Kaiser. Nor does Viqual explain how this allegation relates to the issues on appeal. Accordingly, we consider the argument waived because Viqual fails to provide any meaningful analysis or citation to authority in support of its position. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].)

Viqual next contends the trial court was "unfamiliar" with the record and "admitted it was difficult for it to look through all the volumes of evidence submitted." Viqual's argument grossly misrepresents the record. Clarifying questions, such as those asked by the court regarding the badge, indicate a court that is engaged and proactively ensuring a complete record. And the detailed judgment further evidences the court's comprehension of the issues and record before it. Viqual has not cited any evidence demonstrating otherwise.

Moreover, the court did not express any difficulty in reviewing or understanding the evidence or issues. Rather, the court informed the parties it would need additional time to issue a decision because of other pressing matters and a desire to reread all materials after the matter was submitted— i.e., the court would not rush its decision but rather take additional time to review the materials and issue an order. The court's considered approach to issuing a decision does not create a basis for reversal.

## DISPOSITION

The judgment is affirmed. Kaiser is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

PETROU, J.

WE CONCUR:

TUCHER, P. J.

FUJISAKI, J.

A170337 / *Viqual Medical Technology, LLC v. Kaiser Foundation Health Plan, Inc.*